# EXHIBIT A

WRIT OF SUMMONS IN CIVIL ACTION

NOTICE OF SUIT TO SHERIFF OF ALLEGHENY CO
TO DEFENDANT(S): You are notified that the plaintiff(s)
has/have commenced an action against you which you are
required to Defend.

Kate Barkman, Director, Department of Court Records

Date 1/7/2011

Returnable                2/6/2011

## WRIT OF SUMMONS IN CIVIL ACTION

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| Plaintiff(s)<br>**Parker Hannifin Corporation**<br>**Parker ITR S.R.L.** | Case Number :<br>[GD] – [11] – [000431] |
| | Type of pleading:<br>**PRAECIPE FOR WRIT OF SUMMONS** |
| | Filed on behalf of:<br>**Parker Hannifin Corporation**<br><br>**Andrew M Roman**<br>(Name of the filing party) |
| Vs<br>Defendant(s)<br>**Federal Insurance Company**<br>**National Union Fire Insurance Co. of Pittsburgh PA** | [X] Counsel of Record<br>[ ] Individual, If Pro Se |
| | Name, Address and Telephone Number :<br>**Andrew M Roman**<br>**625 Liberty Avenue**<br>**Pittsburgh , PA 15222** |
| | Attorney's State ID: 23617 |



Kate Barkman, Director, Department of Court Records

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

PARKER HANNIFIN CORPORATION and
PARKER ITR S.R.L.,

               Plaintiffs,

      v.

FEDERAL INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE CO. OF
PITTSBURGH, PENNSYLVANIA,

             Defendants.

CIVIL ACTION

No. GD-11-000431

**COMPLAINT**

Filed on behalf of Plaintiffs:
Parker Hannifin Corporation and
Parker ITR S.r.l.

Counsel of Record for Plaintiffs:

Andrew M. Roman
Pa. Id. No. 23617
Richard A. Ejzak
Pa. Id. No. 56699

COHEN & GRIGSBY, P.C.
Firm No. 621
625 Liberty Avenue
Pittsburgh, PA 15222-3152
412-297-4900

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| PARKER HANNIFIN CORPORATION and<br>PARKER ITR S.R.L., | )<br>) CIVIL ACTION |
| Plaintiffs, | )<br>) No. GD-11-000431 |
| v. | )<br>) |
| FEDERAL INSURANCE COMPANY and<br>NATIONAL UNION FIRE INSURANCE CO. OF<br>PITTSBURGH, PENNSYLVANIA, | )<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

Plaintiffs, Parker Hannifin Corporation ("Parker Hannifin") and Parker ITR S.r.l. ("Parker ITR") (collectively, "Parker"), file the following complaint against Federal Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

### INTRODUCTION

1.    Plaintiffs sustained losses totaling nearly $40 million because of the criminal conduct of a rogue employee. The employee secretly participated in an international price-fixing cartel for decades. Even though Parker was not aware of the cartel or the rogue employee's conduct, Parker has been hit with criminal fines and claims from customers around the world. Defendants, who issued crime insurance policies to Plaintiffs, admit that their policies cover at least some of the conduct engaged in by the rogue employee. Nonetheless, Defendants have refused to reimburse Plaintiffs for any portion of the losses they sustained. Plaintiffs therefore filed the instant lawsuit.

## PARTIES

2.     Plaintiff Parker Hannifin Corporation is a corporation organized under the laws of the State of Ohio, with its principal place of business at 6035 Parkland Boulevard, Cleveland, Ohio 44124-4141.

3.     Plaintiff Parker ITR S.r.l. is an Italian corporation with a principal place of a business at Via Privata Archimede 1, 20094 Corsico, Milan, Italy.

4.     Defendant Federal Insurance Company ("Federal") is an Indiana corporation with a principal place of business at 15 Mountain View Road, Warren, New Jersey, 07059.

5.     Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") is a Pennsylvania corporation with an office at 175 Water Street, 18th Floor, New York, New York 10038.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over each of the Defendants pursuant to 42 Pa. C.S.A. § 5301 and § 5322 because: (1) they have qualified to do business as foreign corporations in Pennsylvania; and/or (2) they have consented to the exercise of jurisdiction in Pennsylvania; and/or (3) they have carried on a continuous and systematic part of their general business in Pennsylvania; and/or (4) they have transacted business within Pennsylvania by, inter alia, doing acts in Pennsylvania for the purpose of realizing pecuniary benefits, contracting to supply services in Pennsylvania and/or contracting to insure persons, property or risks located within Pennsylvania.

7.     This Court has subject matter jurisdiction over this action under 42 Pa. C.S.A. §931.

8.     Venue is proper in this Court pursuant to Rules 1006 and 2179 of the Pennsylvania Rules of Civil Procedure.

-2-

## FACTUAL BACKGROUND

### A.   A Rogue Employee of Parker ITR Participates in a Cartel

9.   Parker Hannifin is a diversified manufacturer of motion and control technologies and systems, providing precision-engineered solutions for a variety of mobile, industrial and aerospace markets.

10.   Parker Hannifin employs approximately 60,000 people in 48 countries around the world.

11.   Before 2002, Parker Hannifin was not involved in the marine oil and gas hose business.

12.   Marine hoses are used to transport petroleum products to and from offshore facilities such as floating storage systems.

13.   In early 2002, Parker Hannifin acquired an Italian entity named ITR Rubber Srl, first entering the marine hose business. A portion of ITR Rubber's business was the sale and supply of marine hose products.

14.   The relevant corporate history that preceded Parker Hannifin's entry into the marine hose business is summarized below:

| | |
|---|---|
| 1986 | Pirelli Treg SpA, an Italian entity, establishes a marine oil and gas hose business |
| 1990 | ITR SpA takes over Pirelli Treg's activities in the marine oil and gas hose business |
| 1993 | SAIAG SpA acquires ITR SpA |
| June 27, 2001 | ITR Rubber Srl is incorporated as a wholly-owned subsidiary of ITR SpA |
| December 5, 2001 | Date of agreement by which Parker Hannifin acquired ITR Rubber from SAIAG |

January 31, 2002      Closing date for Parker Hannifin's acquisition of ITR
                      Rubber (now known as Parker ITR)

15.    Unbeknownst to Parker Hannifin, both at the time of the acquisition and for years thereafter, a price-fixing cartel had existed in the marine hose industry for at least 15 years before Parker Hannifin purchased ITR Rubber.

16.    The ringleader of ITR Rubber's participation in the secretive cartel was Romano Pisciotti.

17.    Pisciotti worked in the marine oil and gas hose business continuously since 1981, first for Pirelli Treg and subsequently for each company that purchased the business, including Parker ITR, where he served as the Business Unit Manager of the marine hose business.

18.    Although Pisciotti was not an officer or director of Parker ITR, his position as manager of the marine hose business gave him the ability, through the means described below, to draw Parker into performing certain activities that authorities later established supported the price-fixing cartel, even though Parker was not aware at the time that a cartel existed.

19.    At all times, both before and after Parker Hannifin purchased the marine hose business, Pisciotti actively concealed the existence of the cartel and his participation in the cartel from Parker.

20.    Emails and other communications from the coordinator of the cartel, Peter Whittle, provide clear proof that the cartel was hidden from Parker.

21.    Other documents, such as reports on cartel meetings and internal memoranda by other cartel members, likewise establish that the cartel members carefully and deliberately concealed their illegal activity from Parker.

22.    Documents authored by Pisciotti himself demonstrate his efforts to keep Parker in

the dark and out of his operations.  For example, Pisciotti rejected a request from Parker

Canada to get involved in the oil and gas business, explaining:

> . . . [W]e have over the years built up where appropriate a network
> of experienced agents who fully understand and are knowledgeable
> of our business and we are able to promote our business both
> commercially and technically through them and to change this
> system by attempting to work through the Parker network would
> be an extremely retrograde step which we cannot afford to take.
> Furthermore, to involve the Parker organization as an extra
> medium of communication with our customers over and above the
> established routes would simply confuse our customers and result
> in worse rather than a better service to them.  Therefore, our
> ongoing policy is not to involve the Parker network in our business
> but to continue in the tried and tested manner which has served us
> so well over the past 30 years.

23.    Pisciotti concealed the existence of the cartel from Parker because he knew that

Parker would never permit him to participate in an anti-competitive scheme.

24.    Secret communications among the cartel members reveal that they all expected

Parker to have zero tolerance for any type of illegal conduct.  Pisciotti therefore went to great

lengths to hide his conduct from Parker.

**B.    Pisciotti's Consultancy Companies**

25.    Pisciotti participated in the cartel so that he could enrich himself and his friends at

the expense of Parker and Parker's customers.

26.    While participating in the cartel, Pisciotti siphoned money from Parker to a

network of companies he and his fellow conspirators set up and controlled.

27.    After Parker became the subject of numerous government investigations and civil

actions regarding the cartel (which are described in detail below), Parker retained the highly-

regarded international firm Kroll Associates UK Limited ("Kroll") to investigate the fraud

Pisciotti perpetrated against Parker.

28.   Kroll's investigation revealed that Pisciotti, together with Peter Whittle (the alleged coordinator of the cartel), Franco Guarneri (an acquaintance of Pisciotti) and possibly others, established a network of companies which enabled them to defraud Parker.

29.   According to Kroll, most of the companies in this network were small entities, often empty shells, which purported to provide intangible services such as generic consulting or sales-related activities like marketing assistance or finder's agreements.

30.   The so-called "consultancy companies" identified by Kroll included the following:

      (1)    Bassi Offshore;

      (2)    Bassi Marine;

      (3)    Offshore Supply Consultants;

      (4)    Tecwaves;

      (5)    Coaster Consultants;

      (6)    International Marine Consultants;

      (7)    Brentwood Enterprises;

      (8)    Page International;

      (9)    Page Oil and Marine Products (renamed Flexomarine);

      (10)    Thomson Trading; and

      (11)    PW Consulting.

31.   Kroll noted that links might also have existed between Pisciotti and other companies belonging to a wider network, including companies identified as Unichester and Talent who were rumored to have connections to Pisciotti, but Kroll was unable to prove those links due to the limited documentation then available and the secretive nature of the ownership structure involving shell companies in offshore jurisdictions, trusts and/or nominees.

32.    While Pisciotti was employed by Parker ITR, he outsourced nearly all operations of the marine hose business to the consultancy companies.  For example, Bassi Offshore, not Parker ITR, performed a broad range of technical and commercial activities that could have and should have been done in-house at Parker ITR, including:

> Engineering services (consisting of hose design, hose building specification, design qualification and design modification to suit customer requirements);
>
> Website (controlling Parker ITR's marine oil and gas hose commercial correspondence through dedicated portals outside Parker);
>
> Factory planning and shop loading (planning when various orders are to be produced as well as controlling Parker ITR's shop loading and production throughput);
>
> Sales and marketing (controlling all aspects of sales and marketing strategy, including pricing and bidding);
>
> After sales service and technical support; and
>
> Customer liaison.

33.    Pisciotti lured key Parker ITR employees to the consultancies to aid his scheme. Kroll noted that Bassi Offshore employed five former Parker ITR employees in order to provide technical consulting services, for which Parker ITR was then invoiced.

34.    Due to the outsourcing, employees at Parker ITR other than Pisciotti were kept in the dark about the projects on which Parker ITR bid, the amount of those bids, and how they were determined.

35.    As part and parcel of the outsourcing, a substantial portion of the funds Parker ITR received from customers was transferred from Parker ITR to Pisciotti's companies.  Kroll estimated that Parker paid a total of approximately EUR 10.5 million over a five year period to the first seven consultancy companies listed above in Paragraph 30.

36.    In short, Parker ITR essentially functioned as nothing more than a pass-through for Pisciotti's companies during the period when he was employed at Parker ITR.

37.    In assessing the damages Parker suffered as a result of payments made to companies linked to Pisciotti, Kroll took a conservative approach and limited its analysis to the consultancy companies. Kroll did not include entities in the wider network of companies that might have been linked to Pisciotti.

38.    With that limitation, Kroll conservatively estimated that Parker suffered damages in excess of EUR 3.6 million, primarily consisting of unnecessary commissions and marketing services paid to Pisciotti's consultancy companies (the "sham payments").

39.    Kroll noted that Parker paid commissions to a number of companies outside of the consultancy layer, some of which were rumored to be linked to Pisciotti. However, Kroll did not include those commissions in its estimate of damages as part of its conservative approach.

40.    Parker paid EUR 138,000 (approximately $187,600) for the services provided by Kroll.

C.    **The Surprise Inspection By The European Commission**

41.    Parker became aware of the material facts and circumstances pertaining to the losses resulting from the cartel and Pisciotti's illegal conduct during the course of and as a result of the investigation of the cartel by the European Commission ("EC").

42.    Parker first became aware of the existence of the EC investigation on May 2, 2007, when the EC made a surprise inspection of Parker ITR's offices in Veniano, Italy.

43.    On the same day, Parker became aware that Giovanni Scodeggio, the person who succeeded Pisciotti as the Business Unit Manager, Oil & Gas for Parker ITR, had been arrested that morning in Houston, Texas.

44.   Parker did not learn of the extent of Pisciotti's participation in the price-fixing cartel, and the resulting financial losses to Parker and Parker's customers, until details of Pisciotti's illegal conduct unfolded during the government investigations of the cartel, as described below.

### D.   The Losses Sustained as a Result of Pisciotti's Conduct

#### 1.   Sham Payments To Pisciotti's Companies

45.   As described above, Kroll estimated that Parker sustained approximately EUR 3.6 million in losses from sham payments to Pisciotti's consultancy companies for unnecessary commissions and marketing activities.

46.   Kroll's estimate was conservative and does not include commissions paid to other companies, even those who were rumored to be linked to Pisciotti.

47.   Kroll's estimate also does not include other payments made to the consultancy companies that constitute the remainder of the EUR 10.5 million Parker paid to those companies.

#### 2.   Fines and Penalties Imposed by Government Authorities

48.   In 2007, agencies in Europe and several countries including the United States initiated proceedings in connection with the price fixing cartel in the marine hose industry. The relevant proceedings are described below.

##### a.   The European Commission

49.   On January 28, 2009, the European Commission ("EC") issued a comprehensive decision that provided detailed information about the cartel (the "EC Decision").

50.   The EC determined that the cartel began operating at least as early as 1986 – that is, more than a decade before Parker Hannifin became involved in the marine hose industry.

51.   The cartel members allegedly engaged in the following anticompetitive activities:

(a)   Fixing prices;

(b)   Fixing quotas;

(c)   Fixing sales conditions;

(d)   Allocating tenders;

(e)   Sharing geographic markets; and

(f)   Exchanging sensitive information on prices, sales volumes and procurement tenders.

52.   The EC described the operation of the cartel as follows:

> Under the scheme, a member of the cartel who obtained a customer inquiry would report it to the cartel coordinator, who would in turn allocate the customer to a "champion," which means the cartel member who was supposed to win the tender. In order to ensure that the tender was allocated to the "champion" in the tendering procedure, the cartel members adopted a reference price list and agreed on the prices that each of them should quote so that all bids would be above the price quoted by the champion.

53.   To facilitate the operation of the cartel, the members conducted general meetings at which many of the basic arrangements were made, such as market quotas to be attributed to each member, price lists, allocation of specific tenders to the "champion" and a determination of the specific prices to be quoted by the champion and the other members for each tender.

54.   Based on its investigation, the EC determined that Parker ITR was one of the companies that participated in the cartel.

55.   Parker Hannifin and Parker ITR advised the European Commission that they were unaware of Pisciotti's actions and that Parker ITR did not make any profits while the cartel was operating but instead suffered losses.

56.    After holding that it was irrelevant that Parker was not aware of Pisciotti's participation in the cartel, the EC imposed a fine on Parker ITR of EUR 25,610,000 (approximately $34 million), and further ruled that Parker Hannifin was jointly and severally liable for EUR 8,320,000 (approximately $11 million) of the fine.

57.    The EC found that Parker was liable for the cartel activity for ITR Rubber and its predecessors even though they were wholly separate corporate entities.  The fine therefore was based on cartel activity beginning in 1986.

58.    The guidelines the European Commission follows for setting fines state that the fine must be large enough to have a deterrent effect:

> The Commission will pay particular attention to the need to ensure that fines have a sufficiently deterrent effect; to that end, it may increase the fine to be imposed on undertakings which have a particularly large turnover beyond the sales of goods or services to which the infringement relates.

59.    To have any deterrent effect, the fine must be larger than whatever benefit the cartel members obtained from their cartel activity.  The EC Guidelines specifically address that point by observing:

> The Commission will also take into account the need to increase the fine in order to exceed the amount of gains improperly made as a result of the infringement where it is possible to estimate that amount.

60.    In the marine hose cartel case, the EC calculated the basic amount of the fine by starting with the aggregate average annual sales of Parker ITR and multiplying that value by 25%, slightly less than the maximum of 30% permitted under the guidelines based on the degree of gravity of the infringement.  The EC next multiplied that figure by the number of years it found Parker ITR liable for participation in the cartel.

61.   The EC applied an additional sum equal to 25% of the relevant sales for deterrence purposes.  According to the EC, this additional sum was added in accordance with the EC Guidelines, which provide in relevant part:

> In addition, irrespective of the duration of the undertaking's participation in the infringement, the Commission will include in the basic amount a sum of between 15% and 25% of the value of sales as defined in Section A above in order to deter undertakings from even entering into horizontal price-fixing, market-sharing and output-limitation agreements.

62.   Accordingly, the fine imposed on Parker ITR includes the maximum additional amount allowed under the EC Guidelines for deterrence.   The EC imposed the fine despite Parker's proof that Parker was unaware of Pisciotti's actions and that Parker ITR did not make excessive profits while the cartel was operating but instead suffered losses.

63.   Parker filed an appeal from the EC decision with the General Court of the European Union, arguing (among other things) that the EC decision improperly held Parker liable for cartel activities that took place before Parker entered the marine hose business.

64.   On appeal, the General Court of the European Union reversed that portion of the EC Decision and reduced Parker ITR's fine to EUR 6,400,000 (approximately $9 million), with Parker Hannifin jointly and severally liable for EUR 6,300,000 (approximately $8.9 million) of the fine amount.

65.   In connection with that ruling, Parker received a reimbursement for the difference between the amount of the original fine (which Parker was required to pay in full when it filed the appeal) and the amount of the reduced fine.

66.   The EC has appealed the decision of the General Court to the European Court of Justice.  That appeal is still pending.

### b. The United States Department of Justice

67. On February 16, 2010, the United States Department of Justice filed a Criminal Information against Parker ITR in federal court charging Parker ITR with violating Section 1 of the Sherman Act by conspiring to suppress and eliminate competition by rigging bids, fixing prices and allocating market share for sales of marine hose in the US and elsewhere.

68. Parker ITR entered into a plea agreement with the government on February 8, 2010 in which Parker ITR agreed to plead guilty to the Sherman Act violation.

69. In the sentencing hearing before the federal court, the President of Parker ITR stated that Parker ITR engaged in the conduct described in the plea agreement "through various employees of the company," a reference to Pisciotti and others who were not as culpable.

70. In the plea agreement, Parker agreed to pay a fine of $2,290,000.

### 3. The Civil Actions Against Parker

### a. The United States Class Actions

71. Five class action complaints regarding the marine hose cartel were filed in federal court – four in the Southern District of Florida and one in the Southern District of New York.

72. The actions were transferred and consolidated into Master Docket Number 08-MDL-1888 in the Southern District of Florida. The consolidated action identifies Parker Hannifin and Parker ITR (among others) as defendants.

73. The plaintiff class consisted of companies who purchased marine hose in the United States.

74. Several of the defendants, including Parker Hannifin and Parker ITR, entered into a settlement agreement with the plaintiffs on June 24, 2009.

75.   Under the terms of the settlement agreement, Parker Hannifin and Parker ITR were released from the claims asserted in the class action in exchange for a payment of $2,900,000.

76.   The court approved the settlement on January 14, 2010.

77.   One of the companies who purchased marine hose from Parker ITR in the United States – specifically, Chevron, Inc. – opted out of the class action. Chevron executed a separate settlement agreement which released Parker Hannifin and Parker ITR in exchange for a payment of $2,406,920.

78.   The separate settlement with Chevron reduced Parker's liability under the class action settlement from $2,900,000 to $2,267,487, which was confirmed by a Notice of Adjustment of Settlement Amount filed in federal court on January 12, 2010.

### b.   The Worldwide Settlement

79.   Parker Hannifin and Parker ITR executed a worldwide settlement of claims by purchasers of marine hose outside of the United States.

80.   The payment required under the terms of the worldwide settlement consists of a lump sum of $11,399,691 plus various expenses and attorneys' fees, for a total of $15,209,691.

81.   One of the companies who purchased marine hose from Parker ITR outside of the United States – specifically, Saudi Aramco – reached a separate settlement with Parker ITR for the sum of $1,362,446. That settlement resulted in a refund to Parker ITR in the same amount from the worldwide settlement fund.

82.   Under the terms of the worldwide settlement, the unclaimed funds remaining in the settlement account at the end of the five year claim period will be returned to Parker.

## C.    The Insurance Policies

83.   Federal provided primary crime insurance coverage to Parker beginning at least as early as 1999.

84.   For the period January 31, 2007 to January 31, 2008, Federal issued a crime insurance policy bearing Policy Number 8159-0221 (the "Federal Policy").  A copy of this policy is attached hereto as Exhibit A.

85.   The Federal Policy has a limit of $25 million and a retention of $500,000.

86.   Under "Employee Theft Insuring Clause 1," the Federal Policy provides the following coverage:

> The Company shall pay the **Parent Organization** for direct loss of **Money, Securities** or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.

87.   The Declarations of the Federal Policy define "Parent Organization" as Parker Hannifin Corporation.

88.   The Federal Policy defines "Insured" as any "Organization," which in turn is defined under Item 4 of the Declarations as Parker Hannifin Corporation and its subsidiaries, which include Parker ITR.

89.   The Federal Policy defines "Theft" as "the unlawful taking of **Money, Securities** or **Property** to the deprivation of:

(a)    an **Insured**, solely for the purpose of Insuring Clause 1; or

(b)    a **Client**, solely for the purpose of Insuring Clause 9. . . ."

90.   Under "Client Coverage Insuring Clause 9," the Federal Policy provides the following coverage:

> The Company shall pay the **Parent Organization** for direct loss of **Money, Securities** or **Property** sustained by a **Client** resulting

from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client's** employees.

91.   Under "Expense Coverage Insuring Clause 10," the Federal Policy provides the following coverage:

> The Company shall pay the **Parent Organization** for . . . **Investigative Expenses** resulting from any loss covered under Insuring Clause 1 through 9 incurred by an **Organization**, but only if such covered loss under Insuring Clauses 1 through 9 is in excess of the Retention applicable to such covered loss.
>
> *   *   *
>
> No Retention shall apply to **Investigative Expenses** or **Computer Violation Expenses** not covered under Insuring Clause 10.

92.   The Federal Policy does not contain an exclusion for losses resulting from the violation of anti-trust or anti-competition laws.

93.   National Union provided Parker with excess crime insurance coverage above Federal's primary coverage beginning at least as early as 1999.

94.   For the period January 31, 2007 to January 31, 2008, National Union issued Parker an excess crime insurance policy bearing Policy Number 966-43-75 (the "National Union Policy"). A copy of the policy that National Union believes was issued to Parker is attached hereto as Exhibit B.

95.   The National Union Policy has a limit of $15 million in excess of the $25 million limit of the Federal Policy.

96.   The National Union Policy is a follow-form policy.

**D.    The Insurers' Wrongful Denial of Coverage**

97.   Parker timely notified the insurers of a claim arising out of Pisciotti's participation in the price-fixing cartel by letter dated July 23, 2007.

98. Parker submitted an initial proof of loss regarding the claim on March 12, 2009 and subsequently submitted supplemental proofs of loss.

99. Parker also produced voluminous documents regarding the claim to the insurers.

100. By letter dated October 29, 2010, Federal informed Parker that it was continuing to investigate the sham payments identified in the Kroll Report and the investigative expenses paid to Kroll. Federal denied coverage for all other losses. Federal further stated that it was continuing to investigate when Parker "discovered" the loss for purposes of determining whether notice was timely.

101. Federal denied coverage despite admitting that, "[d]ue to Pisciotti's involvement in the cartel, Parker unknowingly overcharged its various Clients for their purchase of marine hose and related components."

102. National Union denied coverage for all of Parker's losses by letter dated November 30, 2010, citing Federal's reasons for denying coverage, and citing the underlying limits clause of the National Union excess crime insurance policy.

103. Parker's covered losses and demands for recovery from Federal and National Union are pleaded below in Counts I through V. The damages that Parker seeks in Counts I, II and III, inclusive, exceed the retention of $500,000 in the Federal primary crime policy and, altogether, approximate but do not exceed the policy limits of $25,000,000 in the Federal primary crime insurance policy. The damages that Parker seeks in Counts IV and V, when added either individually or collectively to the damages sought in Counts I-III, exceed $25,000,000, and potentially exceed the combined limits of the Federal and National Union crime insurance policies of $40,000,000 depending on how the proceedings in Europe ultimately are resolved.

## COUNT I
### Breach of Contract
### Failure to Pay Losses in the Nature of Sham Payments

104. The averments of paragraphs 1 through 103 inclusive, are incorporated by reference.

105. Defendants issued the policies of primary and excess crime insurance attached hereto as Exhibits A and B.

106. The sham payments identified in Paragraphs 25 – 39 and 45 – 47 above are covered under Employee Theft Coverage Insuring Clause 1 of the Federal Policy.

107. Plaintiffs have performed all conditions precedent required of them under the policies or such performance has been excused under the circumstances.

108. Defendant Federal was obligated to pay Plaintiffs for the losses incurred in the nature of the sham payments. Defendant National Union was obligated to acknowledge that such losses are covered as underlying covered losses eroding the Federal primary crime insurance policy limits of $25,000,000 because the separate damages pleaded in Counts IV and V are due and payable under the National Union excess policy after the limits of liability of the Federal primary policy have been paid.

109. Federal has refused to pay Parker for these covered losses, and National Union has refused to acknowledge that they are covered as underlying covered losses.

110. The failure and/or refusal of Defendants set forth above constitutes a breach of the contracts of insurance between them and Plaintiffs, which breach is continuing.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants for all losses that Plaintiffs incurred in the nature of the sham payments, together

with attorneys' fees, interest, costs of court and such other and further relief, including equitable

relief, as this Court deems just and proper.

## COUNT II
### Breach of Contract
### Failure to Pay Investigative Expenses

111.   The averments of paragraphs 1 through 110 inclusive, are incorporated by

reference.

112.   Defendants issued the policies of primary and excess crime insurance attached

hereto as Exhibits A and B.

113.   The payments Parker made for the services provided by Kroll identified in

Paragraph 40 are covered under Insuring Clause 10 of the Federal Policy.

114.   Plaintiffs have performed all conditions precedent required of them under the

policies or such performance has been excused under the circumstances.

115.   Defendant Federal was obligated to pay Plaintiffs for the investigative expenses.

Defendant National Union was obligated to acknowledge that such losses are covered as

underlying covered losses eroding the Federal primary crime insurance policy limits of

$25,000,000 because the separate damages pleaded in Counts IV and V are due and payable

under the National Union excess policy after the limits of liability of the Federal primary

policy have been paid.

116.   Federal has refused to pay Parker for these covered losses, and National Union

has refused to acknowledge that they are covered as underlying covered losses.

117.   The failure and/or refusal of Defendants set forth above constitutes a breach of the

contracts of insurance between them and Plaintiffs, which breach is continuing.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants for all investigative expenses that Plaintiffs incurred, together with attorneys' fees,

interest, costs of court and such other and further relief, including equitable relief, as this Court deems just and proper.

## COUNT III
### Breach of Contract
### Failure to Pay Losses in the Nature of Customer Settlement Payments

118. The averments of paragraphs 1 through 117 inclusive, are incorporated by reference.

119. Defendants issued the policies of primary and excess crime insurance attached hereto as Exhibits A and B.

120. The settlement payments identified in Paragraphs 71 – 82 are covered under Employee Theft Coverage Insuring Clause 1 of the Federal Policy.

121. In the alternative, the settlement payments identified in Paragraphs 71 – 82 are covered under Client Coverage Insuring Clause 9 of the Federal Policy.

122. Plaintiffs have performed all conditions precedent required of them under the policies or such performance has been excused under the circumstances.

123. Defendant Federal was obligated to pay Plaintiffs for the losses incurred in the nature of the customer settlement payments. Defendant National Union was obligated to acknowledge that such losses are covered as underlying covered losses eroding the Federal primary crime insurance policy limits of $25,000,000 because the separate damages pleaded in Counts IV and V are due and payable under the National Union excess policy after the limits of liability of the Federal primary policy have been paid.

124. Federal has refused to pay Parker for these covered losses, and National Union has refused to acknowledge that they are covered as underlying covered losses.

125. The failure and/or refusal of Defendants set forth above constitutes a breach of the contracts of insurance between them and Plaintiffs, which breach is continuing.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants for all losses that Plaintiffs incurred in the nature of the customer settlement payments, together with attorneys' fees, interest, costs of court and such other and further relief, including equitable relief, as this Court deems just and proper.

## COUNT IV
### Breach of Contract

**Failure to Pay Losses in the Nature of the European Commission Fines and Penalties**

126. The averments of paragraphs 1 through 125 inclusive, are incorporated by reference.

127. Defendants issued the policies of primary and excess crime insurance attached hereto as Exhibits A and B.

128. The European Commission fines and penalties identified in Paragraphs 49 – 66 are covered under Employee Theft Coverage Insuring Clause 1 of the Federal Policy.

129. In the alternative, the European Commission fines and penalties identified in Paragraphs 49 – 66 are covered under Client Coverage Insuring Clause 9 of the Federal Policy.

130. Plaintiffs have performed all conditions precedent required of them under the policies or such performance has been excused under the circumstances.

131. Defendants were obligated to pay Plaintiffs for the losses incurred in the nature of the fines and penalties.

132. Defendants have failed and/or refused to pay Plaintiffs for those losses.

133. The failure and/or refusal of Defendants set forth above constitutes a breach of the contracts of insurance between them and Plaintiffs, which breach is continuing.

134. Defendants are jointly and/or severally liable, subject to applicable retention or underlying limits provisions and policy limits, to pay Plaintiffs for the losses incurred in the nature of the European Commission fines and penalties.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants for all losses that Plaintiffs incurred in the nature of the European Commission fines and penalties, together with attorneys' fees, interest, costs of court and such other and further relief, including equitable relief, as this Court deems just and proper.

## COUNT V
### Breach of Contract
### Failure to Pay Losses in the Nature of the US DOJ Fines and Penalties

135. The averments of paragraphs 1 through 134 inclusive, are incorporated by reference.

136. Defendants issued the policies of primary and excess crime insurance attached hereto as Exhibits A and B.

137. The United States Department of Justice fines and penalties identified in Paragraphs 67 – 70 are covered under Employee Theft Coverage Insuring Clause 1 of the Federal Policy.

138. In the alternative, the United States Department of Justice fines and penalties identified in Paragraphs 67 – 70 are covered under Client Coverage Insuring Clause 9 of the Federal Policy.

139. Plaintiffs have performed all conditions precedent required of them under the policies or such performance has been excused under the circumstances.

140. Defendants were obligated to pay Plaintiffs for the losses incurred in the nature of the fines and penalties.

141. Defendants have failed and/or refused to pay Plaintiffs for those losses.

142. The failure and/or refusal of Defendants set forth above constitutes a breach of the contracts of insurance between them and Plaintiffs, which breach is continuing.

143. Defendants are jointly and/or severally liable, subject to applicable retention or underlying limits provisions and policy limits, to pay Plaintiffs for the losses incurred in the nature of the United States Department of Justice fines and penalties.

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants for all losses that Plaintiffs incurred in the nature of the United States Department of Justice fines and penalties, together with attorneys' fees, interest, costs of court and such other and further relief, including equitable relief, as this Court deems just and proper.

### A JURY TRIAL IS DEMANDED FOR ALL COUNTS.

Respectfully submitted,

COHEN & GRIGSBY, P.C.

By: _____

Andrew M. Roman
PA Id. No. 23617
Richard A. Ejzak
PA Id. No. 56699

625 Liberty Avenue
Pittsburgh, PA 15222
Telephone:  (412) 297-4900
Facsimile:  (412) 209-0672

Counsel for Plaintiffs,
Parker Hannifin Corporation,
Parker ITR S.r.l.

Dated:  October 7, 2013

1879407.v2

# EXHIBIT A



CHUBB

Executive Protection Portfolio

PREMIUM BILL

Insured:   PARKER HANNIFIN CORPORATION                    Date:   02/08/2007

Producer:   AON RISK SERVICES, INC. OF OHIO
            1660 W. 2ND STREET, #650
            CLEVELAND, OH 441130000

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Product:   Executive Protection Portfolio

Policy Number: 8159-0221

Policy Period:   January 31, 2007 to January 31, 2008

   )TE: - PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE
RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE.

| Product | Effective Date | Premium |
|---------|----------------|---------|
| CRIME   | 01/31/07       | $165,000.00 |
|         |                |         |
|         |                |         |

| | |
|---|---|
| TOTAL POLICY PREMIUM | $165,000.00 |
| TOTAL INSTALLMENT PREMIUM DUE | $165,000.00 |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Form 14-02-1324I (Rev. 1/99)



Chubb & Son, div. of Federal Insurance Company
as manager of the member Insurers of the
Chubb Group of Insurance Companies

# POLICYHOLDER
# DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
### (for policies with no terrorism exclusion or sublimit)

You are hereby notified that, under the Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, this policy makes available to you insurance for losses arising out of certain acts of international terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 90% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ -0-.

If you have any questions about this notice, please contact your agent or broker.



CHUBB

**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

*Executive Protection Portfolio* <sup>SM</sup>
*General Terms and Conditions Section*

---

**DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under
the laws of Indiana, herein called the Company

Policy Number: 8159-0221

THE EXECUTIVE LIABILITY· AND ENTITY SECURITIES LIABILITY, FIDUCIARY LIABILITY, OUTSIDE DIRECTORSHIP LIABILITY AND EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTIONS (WHICHEVER ARE PURCHASED) PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY EXTENDED REPORTING PERIOD. THE APPLICABLE LIMIT(S) OF ·LIABILITY TO PAY "LOSS" WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF "DEFENSE COSTS" UNLESS OTHERWISE SPECIFIED HEREIN. "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. READ THE ENTIRE POLICY CAREFULLY.

Item 1.   **Parent Organization:**      PARKER HANNIFIN CORPORATION
          **Principal Address:**        6035 PARKLAND BOULEVARD
                                        CLEVELAND, OH 44124

Item 2.   **Policy Period:**     From   12:01 A.M. on      January 31, 2007
                                 To     12:01 A.M. on      January 31, 2008
                                 Local time at the address shown in Item 1.

Item 3.   Coverage Summary
          Description:
            GENERAL TERMS AND CONDITIONS
            CRIME

Item 4.   Termination of
          Prior Bonds or Policies: 8159-0221  (Jan 31, 2006 - Jan 31, 2007)

Chubb Group of Insurance Companies
15 Mountain View Road
Warren, New Jersey 07059

*Executive Protection Portfolio* SM
*General Terms and Conditions Section*

In witness whereof, the Company issuing this policy has caused this policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

### FEDERAL INSURANCE COMPANY

_____
Secretary

_____
02/08/07
Date

_____
President

_____
Authorized Representative

*Executive Protection Portfolio* [SM]
*General Terms and Conditions Section*

In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this policy, the Company and the Insureds agree as follows:

## Territory

1.  Coverage shall extend anywhere in the world.

## Terms and Conditions

2.  Except for these General Terms and Conditions or unless stated to the contrary in any coverage section of this policy, the terms and conditions of each coverage section shall apply only to that coverage section. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any coverage section, the terms and conditions of such coverage section shall control for purposes of that coverage section. Any defined term referenced in these General Terms and Conditions but defined in a coverage section shall, for purposes of coverage under that coverage section, have the meaning set forth in that coverage section.

## Definitions

3.  When used in this policy:

    **Claim** shall have the meaning set forth in the applicable coverage section.

    **Insured** shall have the meaning set forth in the applicable coverage section.

    **Parent Organization** means the organization designated in Item 1 of the Declarations of these General Terms and Conditions.

    **Policy Period** means the period of time specified in Item 2 of the Declarations of these General Terms and Conditions, subject to prior termination in accordance with Subsection 11 below. If this period is less than or greater than one year, then the limits of liability specified in the Declarations for each coverage section shall be the Company's maximum limit of liability under such coverage section for the entire period.

## Limits of Liability and Retentions

4.  Unless stated to the contrary in any coverage section, the limits of liability and retentions shown for each coverage section are separate limits of liability and separate retentions pertaining to the coverage section for which they are shown. Unless stated to the contrary in any coverage section of this policy, the payment of a retention under one coverage section shall not constitute payment of, and shall not reduce, the applicable retention under any other coverage section.

## Notice

*Executive Protection Portfolio* <sup>SM</sup>
*General Terms and Conditions Section*

5.   Any notice to the Company with respect to any coverage section shall designate the coverage section under which notice is being given and shall be treated as notice only under the coverage section(s) so designated.

Notice to the Company of a **Claim**, or of circumstances which could give rise to a **Claim**, shall be given in writing addressed to:

> Attn: Claims Department
> Chubb Group of Insurance Companies
> 82 Hopmeadow Street
> Simsbury, Connecticut 06070-7683

All other notices to the Company shall be given in writing addressed to:

> Attn: Underwriting
> Chubb Group of Insurance Companies
> 82 Hopmeadow Street
> Simsbury, Connecticut 06070-7683

Any such notice shall be effective on the date of receipt by the Company at such address.

---

*Valuation and Foreign Currency*

6.   All premiums, limits, retentions, loss and other amounts under this policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in any coverage section, if a judgment is rendered, a settlement is denominated or any element of loss under this policy is stated in a currency other than United States of America dollars, payment under this policy shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the judgment becomes final, the amount of the settlement is agreed upon or the element of loss is due, respectively.

---

*Subrogation*

7.   In the event of any payment under this policy, the Company shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery, and such **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit or otherwise pursue subrogation rights in the name of the **Insured**.

*Action Against the Company*



8. No action may be taken against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy. No person or entity shall have any right under this policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Company be impleaded by such **Insured** or legal representatives of such **Insured**.

## Parent Organization Rights and Obligations

9. By acceptance of this policy, the **Parent Organization** agrees that it shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to: the payment of premiums and the receiving of any return premiums that may become due under this policy; the negotiation, agreement to and acceptance of endorsements; the giving or receiving of any notice provided for in this policy (except the giving of notice to apply for an Extended Reporting Period); the adjustment of loss amounts; and the receipt or enforcement of payment of loss (and the **Parent Organization** further agrees that it shall be responsible for application of any such payment as provided in this policy). Each **Insured** agrees that the **Parent Organization** shall act on its behalf with respect to all such matters.

## Alteration and Assignment

10. No change in, modification of, or assignment of interest under this policy shall be effective except when made by written endorsement to this policy which is signed by an authorized employee of Chubb & Son, a division of Federal Insurance Company.

## Termination of Policy or Coverage Section

11. This policy or any coverage section shall terminate at the earliest of the following times:

    (a) sixty days after receipt by the **Parent Organization** of written notice of termination from the Company for any reason other than non-payment of premium;

    (b) twenty days after receipt by the **Parent Organization** of written notice of termination from the Company for non-payment of premium;

    (c) upon receipt by the Company of written notice of termination from the **Parent Organization**; provided that this policy may not be terminated by the **Parent Organization** after the effective date of any acquisition of the **Parent Organization** as described in the Changes in Exposure subsection of the applicable coverage section of this policy;

    (d) upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations of these General Terms and Conditions; or

    (e) at such other time as may be agreed upon by the Company and the **Parent Organization**.

    The Company shall refund the unearned premium computed at customary short rates if this policy or any coverage section is terminated by the **Parent Organization**. Under any other

circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of a notice of termination, but such payment shall be made as soon as practicable thereafter.

## Termination of Prior Bonds or Policies

12. Any bonds or policies issued by the Company or its affiliates and specified in Item 4 of the Declarations of these General Terms and Conditions shall terminate, if not already terminated, as of the inception of this policy.

## Bankruptcy

13. Bankruptcy or insolvency of any **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights or defenses under this policy.

## Headings

14. The descriptions in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.


CHUBB

# Schedule of Forms

To be attached to and form part of          Company:    Federal Insurance Company
Policy No.    8159-0221

Issued to:    PARKER HANNIFIN CORPORATION

Executive Protection Portfolio General Terms and Conditions Section (Federal & Vigilant)

14-02-7564 (11/02 ed.)

14-02-7926 (3/03 ed.)

14-02-9228 (4/04 ed.)

Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

14-02-10570 (3/05 ed.)

14-02-3037 (11/99 ed.)

02-7398 (10/02 ed.)

14-02-7398 (10/02 ed.)

14-02-7400 (10/02 ed.)

14-02-7402 (10/02 ed.)

14-02-8574 (7/03 ed.)

14-02-8754 (8/03 ed.)

14-02-8787 (9/03 ed.)

14-02-8850 (10/03 ed.)

14-02-8907 (10/04 ed.)

14-02-8923 (11/03 ed.)

14-02-8924 (11/03 ed.)

14-02-8925 (11/03 ed.)

14-02-8926 (11/03 ed.)

14-02-8927 (11/03 ed.)

14-02-8928 (11/03 ed.)

14-02-8931 (1/04 ed.)

14-02-8932 (11/03 ed.)

02-8933 (11/03 ed.)

14-02-9146 (2/04 ed.)

14-02-9261 (4/04 ed.)

14-02-9262 (4/04 ed.)

14-02-9264 (Ed. 04/04)

# Schedule of Forms

To be attached to and form part of
Policy No.   8159-0221

Company:   Federal Insurance Company

Issued to:   PARKER HANNIFIN CORPORATION


CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio General Terms and Conditions Section (Federal & Vigilant)

Effective date of
this endorsement:  January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

### OHIO AMENDATORY ENDORSEMENT
### TO THE GENERAL TERMS AND CONDITIONS SECTION

In consideration of the premium charged, it is agreed that:

1.      With respect to each coverage section other than the Crime Coverage Section and the
        Kidnap/Ransom and Extortion Coverage Section, Subsection 11. Termination of Policy or
        Coverage Section (a) of the General Terms and Conditions Section is amended by adding the
        following at the end of such paragraph (a):

        "provided that, if this policy or the applicable coverage section has been in effect for ninety (90)
        days, the Company may cancel this policy or such coverage section, other than for non-payment
        of premium, for one or more of the following reasons:

        (1)     Discovery of fraud or material misrepresentation in the procurement of this policy or with
                respect to any Claims submitted thereunder;

        (2)     Discovery of a moral hazard or willful or reckless acts or omissions on the part of the
                Parent Organization which increase any hazard insured against;

        (3)     The occurrence of a change in the individual risk which substantially increases any
                hazard insured against after this policy has been issued or renewed, except to the extent
                the Company should reasonably have foreseen the change or contemplated the risk in
                writing this policy;

        (4)     Loss of applicable reinsurance, or a substantial decrease in applicable reinsurance, if the
                Superintendent of Insurance determines that reasonable efforts were made to maintain or
                replace the reinsurance;

        (5)     Failure of an Insured to correct material violations of safety codes or to comply with
                reasonable written loss control recommendations; or

        (6)     A determination by the Superintendent of Insurance that the continuation of this policy
                would create a condition that would be hazardous to the policyholders or the public."

2.      With respect to each coverage section other than the Crime Coverage Section and the
        Kidnap/Ransom and Extortion Coverage Section, Subsection 11. Termination of Policy or

Coverage Section (d) of the General Terms and Conditions Section is amended by adding the following at the end of such paragraph (d):

"provided that non-renewal by the Company is effective only if the Company mails or delivers at least thirty (30) days advance written notice of non-renewal, stating the policy number, the date of notice and expiration date, to the Parent Organization at the last address known to the Company, with a copy to the agent or broker of record, if any; or"

3.   With respect to each coverage section other than the Crime Coverage Section and the Kidnap/Ransom and Extortion Coverage Section, Subsection 11. Termination of Policy or Coverage Section of the General Terms and Conditions Section is amended by adding the following at the end of such Subsection:

"Notice of cancellation by the Company will state the reason(s) therefor.  A copy of such notice will be provided to the agent or broker of record, if any."

4.   Within forty-five (45) days of any written request by the Parent Organization, as to the Executive Liability and Entity Securities Liability Coverage Section, the Outside Directorship Liability Coverage Section, the Employment Practices Liability Coverage Section and the Fiduciary Liability Coverage Section, if purchased, the Company will give the Parent Organization a summary of all Claims and circumstances which may give rise to a Claim for which the Company received notice during the Policy Period, and a statement of any Loss paid by the Company in connection therewith as of the date of such summary.

5.   Nothing in the above provisions of this Amendatory Endorsement amends the provisions of Subsection 11. Termination of Policy or Coverage Section as such provisions apply to the Crime Coverage Section or the Kidnap/Ransom and Extortion Coverage Section.

6.   References in this Amendatory Endorsement to a particular coverage section are applicable only to the extent that such coverage section has been issued to the Parent Organization.  The coverage sections issued to the Parent Organization are those set forth in the applicable Declarations and nothing herein is intended to, nor does it, establish coverage under any coverage section that has not been issued to the Parent Organization as part of the policy.

The policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of the policy or any endorsement to the policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such policy or endorsement provisions comply with the applicable insurance laws of the state of Ohio.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

Authorized Representative



ENDORSEMENT

Coverage Section:  Executive Protection Portfolio General Terms and Conditions Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 2

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND SUBSECTION 11 ENDORSEMENT

In consideration of the premium charged, it is agreed that clause (a) of Subsection 11. Termination of
Policy or Coverage Section is deleted.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative


CHUBB

**ENDORSEMENT/RIDER**

Coverage Section: Executive Protection Portfolio General Terms and Conditions Section (Federal & Vigilant)

Effective date of
this endorsement/rider: January 31, 2007

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

---

## COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other laws
or regulations prohibit the coverage provided by this insurance.

⌐L OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date: February 8, 2007

By _____
Authorized Representative



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey  07059

*Executive Protection Portfolio* <sup>SM</sup>
*Crime Coverage Section*

---

**DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under
the laws of Indiana, herein called the Company

**READ THE ENTIRE POLICY CAREFULLY.**

Item 1.  **Parent Organization:**
  PARKER HANNIFIN CORPORATION
  6035 PARKLAND BOULEVARD
  CLEVELAND, OH 44124

Item 2.  Insuring Clauses:                                                                    Limits of Liability:

|     |     |     |
| --- | --- | --- |
| (A) | Insuring Clause  1 - Employee Theft Coverage: | $25,000,000.00 |
| (B) | Insuring Clause  2 - Premises Coverage: | $25,000,000.00 |
| (C) | Insuring Clause  3 - In Transit Coverage: | $25,000,000.00 |
| (D) | Insuring Clause  4 - Forgery Coverage: | $25,000,000.00 |
| (E) | Insuring Clause  5 - Computer Fraud Coverage: | $25,000,000.00 |
| (F) | Insuring Clause  6 - Funds Transfer Fraud Coverage: | $25,000,000.00 |
| (G) | Insuring Clause  7 - Money Orders And Counterfeit Fraud Coverage: | $10,000,000.00 |
| (H) | Insuring Clause  8 - Credit Card Fraud Coverage: | $10,000,000.00 |
| (I) | Insuring Clause  9 - Client Coverage: | $25,000,000.00 |
| (J) | Insuring Clause 10 - Expense Coverage: | $250,000.00 |

Item 3.  Retention:                                                                              $500,000.00

Item 4.  **Organization**
  PARKER HANNIFIN CORPORATION and its Subsidiaries



*Executive Protection Portfolio* <sup>SM</sup>

*Crime Coverage Section*

In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the limitations, conditions, provisions and other terms of this coverage section, the Company and the Insureds agree as follows:

### *Insuring Clauses*

*Employee Theft Coverage Insuring Clause 1*

1. The Company shall pay the **Parent Organization** for direct loss of **Money, Securities** or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.

*Premises Coverage Insuring Clause 2*

2. The Company shall pay the **Parent Organization** for direct loss sustained by an **Organization** resulting from:

   (a) the unlawful taking of **Money** or **Securities** committed by a **Third Party**; or

   (b) the actual destruction or disappearance of **Money** or **Securities**,

   within or from the **Premises** or **Banking Premises**.

   Coverage under this Insuring Clause shall also include:

   (i) direct loss of or damage to **Property** which results from **Robbery** or attempted **Robbery** within the **Premises**;

   (ii) direct loss of or damage to **Property** contained within any locked vault or safe which results from **Safe Burglary** or attempted **Safe Burglary** within the **Premises**;

   (iii) damage to a locked safe, cash drawer, cash box or cash register within the **Premises** by felonious entry or attempted felonious entry or loss by felonious abstraction of such container from within the **Premises**; and

   (iv) damage to the **Premises** which results from **Robbery** or **Safe Burglary**,

   committed by a **Third Party**.

*In Transit Coverage Insuring Clause 3*

3. The Company shall pay the **Parent Organization** for direct loss sustained by an **Organization** resulting from:

   (a) the unlawful taking of **Money** or **Securities** committed by a **Third Party**; or

   (b) the actual destruction or disappearance of **Money** or **Securities**,

*Executive Protection Portfolio* SM
*Crime Coverage Section*

while **In Transit** or while temporarily within the home of an **Employee** or an **Organization**.

Coverage under this Insuring Clause shall also include:

(i)    direct loss of or damage to **Property** which results from **Robbery** while **In Transit**; and

(ii)    direct loss which results from the unlawful taking of **Property** temporarily within the home of an **Employee** or an **Organization**,

committed by a **Third Party**.

---

*Forgery Coverage Insuring Clause 4*

4.    The Company shall pay the **Parent Organization** for direct loss sustained by an **Organization** resulting from **Forgery** or alteration of a **Financial Instrument** committed by a **Third Party**, including:

(a)    any check or draft made or drawn in the name of such **Organization** payable to a fictitious payee and endorsed in the name of such fictitious payee;

(b)    any check or draft procured in a face to face transaction with such **Organization** or with one acting as the agent of such **Organization** by a **Third Party** impersonating another and made or drawn payable to the one impersonated and endorsed by a **Third Party** other than such one impersonated; and

(c)    any payroll check, payroll draft or payroll order made or drawn by such **Organization** payable to bearer as well as to a named payee and endorsed by a **Third Party** other than such named payee without the authority of such named payee.

---

*Computer Fraud Coverage Insuring Clause 5*

5.    The Company shall pay the **Parent Organization** for direct loss of **Money, Securities** or **Property** sustained by an **Organization** resulting from **Computer Fraud** committed by a **Third Party**.

---

*Funds Transfer Fraud Coverage Insuring Clause 6*

6.    The Company shall pay the **Parent Organization** for direct loss of **Money** or **Securities** sustained by an **Organization** resulting from **Funds Transfer Fraud** committed by a **Third Party**.



---

*Money Orders And Counterfeit Currency Fraud Coverage Insuring Clause 7*

7.   The Company shall pay the **Parent Organization** for direct loss sustained by an **Organization** resulting from **Money Orders And Counterfeit Currency Fraud** committed by a **Third Party.**

---

*Credit Card Fraud Coverage Insuring Clause 8*

8.   The Company shall pay the **Parent Organization** for direct loss sustained by an **Organization** resulting from **Credit Card Fraud** committed by a **Third Party.**

---

*Client Coverage Insuring Clause 9*

9.   The Company shall pay the **Parent Organization** for direct loss of **Money, Securities** or **Property** sustained by a **Client** resulting from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client's** employees.

---

*Expense Coverage Insuring Clause 10*

10.   The Company shall pay the **Parent Organization** for:

(a)   **Investigative Expenses** resulting from any loss covered under Insuring Clauses 1 through 9 incurred by an **Organization,** but only if such covered loss under Insuring Clauses 1 through 9 is in excess of the Retention applicable to such covered loss;

(b)   **Computer Violation Expenses** resulting from any loss covered under Insuring Clause 1, 5 or 9 incurred by an **Organization,** but only if such covered loss under Insuring Clause 1, 5 or 9 is in excess of the Retention applicable to such covered loss.

No Retention shall apply to **Investigative Expenses** or **Computer Violation Expenses** covered under Insuring Clause 10.

---

### Definitions

11.   When used in this coverage section:

**Banking Premises** means the interior portion of a building occupied by, or the night depository chute or safe maintained by, any bank, trust company or similar financial institution.

**Client** means a customer of an **Organization** to whom such **Organization** provides goods or services under written contract or for a fee.

**Computer Fraud** means the unlawful taking or the fraudulently induced transfer of **Money, Securities** or **Property** resulting from a **Computer Violation.**

**Computer System** means a computer and all input, output, processing, storage, off-line media library and communication facilities which are connected to such computer, provided

**Executive Protection Portfolio** <sup>SM</sup>

*Crime Coverage Section*

that such computer and facilities are owned and operated or leased and operated by an **Organization.**

**Computer Violation** means the fraudulent:

(a) entry of **Data** into or deletion of **Data** from a **Computer System;**

(b) change to **Data** elements or program logic of a **Computer System,** which is kept in machine readable format; or

(c) introduction of instructions, programmatic or otherwise, which propagate themselves through a **Computer System,**

directed against an **Organization.**

**Computer Violation Expenses** means reasonable expenses, other than an **Organization's** internal corporate costs (such as **Salary**), incurred by an **Organization,** with the Company's prior written consent, to reproduce or duplicate damaged or destroyed **Data** or computer programs. If such **Data** or computer programs cannot be duplicated from other **Data** or computer programs, then **Computer Violation Expenses** shall also include reasonable costs incurred for computer time, computer programmers, technical experts or consultants to restore such **Data** or computer programs to substantially the same level or operational capability existing immediately before the covered loss. **Computer Violation Expenses** shall not include expenses incurred by any **Client.**

**Credit Card Fraud** means the **Forgery** or alteration of, on or in any written instrument required in connection with any credit card issued to an **Organization** or, at the request of an **Organization,** to an **Employee.**

**Data** means a representation of information, knowledge, facts, concepts or instructions which are processed and stored in a **Computer System.**

**Discovery** or **Discovered** means an **Executive** or **Insurance Representative** has become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this coverage section has occurred or acts have taken place that may subsequently result in a loss of a type covered by this coverage section. This includes loss:

(a) sustained prior to the inception date of any coverage under this coverage section;

(b) which is within the applicable Retention as set forth in Item 3 of the Declarations for this coverage section; or

(c) for which the exact amount or details are unknown.

**Discovery** or **Discovered** shall not include knowledge acquired by an **Executive** or **Insurance Representative** acting alone in a **Theft** or **Forgery,** or acting in collusion with any **Employee** in a **Theft** or **Forgery.**

**Employee** means any:



*Executive Protection Portfolio* SM
*Crime Coverage Section*

(a)   natural person while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** compensates by **Salary** and has the right to govern and direct in the performance of such service, including any part-time, seasonal, leased or temporary employee;

(b)   natural person volunteer while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** has the right to govern and direct in the performance of such service;

(c)   **Executive** while performing acts within the scope of the usual duties of an **Employee**; or

(d)   natural person fiduciary, trustee, administrator or other plan official, while in the regular service of an **ERISA Plan**, who is required to be bonded by an **Organization** in connection with such **ERISA Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended.

**ERISA Plan** means any Employee Benefit Plan, Pension Benefit Plan, or Welfare Benefit Plan, defined and required to be bonded under Title 1 of the Employee Retirement Income Security Act of 1974, as amended, which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization for the benefit of **Employees** and which existed on or before the inception of this coverage section or which is created or acquired after the inception of this coverage section.

**Executive** means any natural person specified below:

(a)   duly elected or appointed director, officer, member of the Board of Managers or management committee member of an **Organization** chartered in the United States of America;

(b)   in-house general counsel of an **Organization** chartered in the United States of America;

(c)   equivalent positions of (a) or (b) above in an **Organization** chartered in any other jurisdiction anywhere in the world; or

(d)   a partner of an **Organization** while engaged in the regular service of such **Organization**.

**Financial Instrument** means a check, draft or similar written promise, order or direction to pay a sum certain in **Money** that is made, drawn by or drawn upon an **Organization** or made or drawn by anyone acting as an **Organization's** agent, or that is purported to have been so made or drawn.

**Forgery** means the signing of the name of another natural person or organization, with the intent to deceive, but does not mean a signature that includes, in whole or in part, one's own name, with or without authority, in any capacity for any purpose.  Mechanically or electronically produced or reproduced signatures shall be treated the same as hand-written signatures.

**Funds Transfer Fraud** means fraudulent electronic, telegraphic, cable, teletype, facsimile, telephone or written instructions (other than **Forgery**), purportedly issued by an **Organization**, and issued to a financial institution directing such institution to transfer, pay

**Executive Protection Portfolio** [SM]
Crime Coverage Section

or deliver **Money** or **Securities** from any account maintained by such **Organization** at such institution, without such **Organization's** knowledge or consent.

**Insurance Representative** means any **Employee**, including a risk manager, designated to represent an **Insured** for the purpose of effecting and maintaining insurance.

**Insured** means any **Organization** and, for the purposes of Insuring Clause 1, any **ERISA Plan** or **Non-ERISA Plan**.

**In Transit** means being conveyed outside the **Premises**, from one person or place to another, by an **Organization** within the custody of:

(a)    an **Employee**; or

(b)    a person duly authorized by such **Organization** to have custody of such **Money**, **Securities** or **Property**.

Such conveyance begins immediately upon receipt of **Money, Securities** or **Property** by the person(s) described in (a) or (b) above from such **Organization**, and ceases immediately upon delivery to the designated recipient or its agent.

**Investigative Expenses** means reasonable expenses, other than an **Organization's** internal corporate costs (such as **Salary**), incurred by an **Organization**, with the Company's prior written consent, to establish the existence and amount of a covered loss. **Investigative Expenses** shall not include expenses incurred by any **Client**.

**Money** means currency, coin, bank notes and bullion.

**Money Orders And Counterfeit Currency Fraud** means the good faith acceptance by an **Organization**:

(a)    in exchange for merchandise, **Money** or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or

(b)    in the regular course of business, of counterfeit United States of America or Canadian paper currency.

**Non-ERISA Plan** means any employee benefit plan not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization for the benefit of **Employees** and which existed on or before the inception of this coverage section or which is created or acquired after the inception of this coverage section.

**Organization** means any organization designated in Item 4 of the Declarations for this coverage section.

**Premises** means the interior portion of a building occupied by an **Organization** in conducting its business.

**Property** means tangible property other than **Money** or **Securities**.



*Executive Protection Portfolio* <sup>SM</sup>
*Crime Coverage Section*

**Robbery** means the unlawful taking of **Money**, **Securities** or **Property** from the custody of an **Employee**, or other person (except a person acting as a watchman, porter or janitor) duly authorized by an **Organization** to have custody of such **Money**, **Securites** or **Property**, by violence or threat of violence, committed in the presence and cognizance of such **Employee** or other person.

**Safe Burglary** means the unlawful taking of **Money**, **Securities** or **Property**, by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the **Premises**.

**Salary** means compensation an **Organization** pays an **Employee**, including bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

**Securities** means negotiable and non-negotiable Instruments or contracts representing either **Money** or **Property**.

**Subsidiary**, either in the singular or plural, means any organization while more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of or to appoint directors, members of the Board of Managers, or management committee members of such organization are owned or controlled, directly or indirectly, in any combination, by one or more **Organizations**.

**Theft** means the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of:

(a)   an **Insured**, solely for the purposes of Insuring Clause 1; or

(b)   a **Client**, solely for the purposes of Insuring Clause 9.

**Third Party** means a natural person other than:

(a)   an **Employee**; or

(b)   a natural person acting in collusion with an **Employee**.

---

## Exclusions

12.   No coverage will be available under this coverage section for:

(a)   loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Property**, whether or not in the name of an **Insured** and whether or not in a genuine or fictitious account; provided that this Exclusion 12(a) shall not apply to otherwise covered loss under Insuring Clause 1 which results in improper financial gain to an **Employee** (such loss shall mean only the amount of improper financial gain to such **Employee**, and shall not include **Salary**, commissions, fees or other compensation, including but not limited to promotions and raises associated with employment, paid by the **Insured** to such **Employee**);

(b)   loss of any trade secret, confidential processing method or other confidential information of any kind;

(c)   loss due to **Theft** or **Forgery** committed by a partner of an **Organization**, whether acting alone or in collusion with others; provided that, if such **Theft** or **Forgery** would

*Executive Protection Portfolio* SM
*Crime Coverage Section*

otherwise be covered under Insuring Clause 1 or 9, this Exclusion 12(c) shall not apply to the extent coverage under this coverage section is excess of the amount of such partner's percentage ownership of such **Organization**, on the day immediately preceding the date of **Discovery**, multiplied by such **Organization's** total assets as reflected in such **Organization's** most recent audited financial statements;

(d)    loss or damage due to declared or undeclared war, civil war, insurrection, rebellion, revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization, or any act or condition incident to any of the foregoing;

(e)    loss or damage due to nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition incident to any of the foregoing;

(f)    loss of income not realized as the result of a covered loss;

(g)    indirect or consequential loss or damage of any kind; provided that this Exclusion 12(g) shall not apply to otherwise covered **Investigative Expenses** and **Computer Violation Expenses** under Insuring Clause 10;

(h)    fees, costs or expenses incurred or paid:

    (i)    as a result of the reconstitution of **Data** if an **Organization** knowingly used illegal copies of programs;

    (ii)    to render the **Data** usable by replacement processing equipment;

    (iii)    to design, update or improve software or programs or to perfect their operation or performance; or

    (iv)    as a result of an alteration in **Data** held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities;

(i)    fees, costs or expenses incurred or paid in defending or prosecuting any legal proceeding or claim; provided that this Exclusion 12(i) shall not apply to the coverage provided under Subsection 22 Legal Expenses Extension;

(j)    loss or damage due to fire; provided that this Exclusion 12(j) shall not apply to:

    (i)    loss of **Money** or **Securities**; or

    (ii)    damage to any safe or vault caused by the application of fire thereto for the purposes of **Safe Burglary**;

(k)    loss due to an **Insured** knowingly having given or surrendered **Money, Securities** or **Property** in any exchange or purchase with a **Third Party**; provided that this Exclusion 12(k) shall not apply to otherwise covered loss under Insuring Clause 7 or otherwise covered loss of **Property** under Insuring Clause 5;

(l)    loss sustained by one **Insured** to the advantage of any other **Insured**;



*Executive Protection Portfolio* [SM]
*Crime Coverage Section*

(m)   loss of or damage to **Money**, **Securities** or **Property** while in the custody of any bank, trust company, similar recognized place of safe deposit, armored motor vehicle company or any person who is duly authorized by an **Organization** to have custody of such **Money**, **Securities** or **Property**; provided that this Exclusion 12(m) shall not apply to the extent that coverage under this coverage section is excess of the amount recovered or received by such **Organization** under:

   (i)   such **Organization's** contract, if any, with, or insurance carried by, any of the foregoing; or

   (ii)   any other insurance or indemnity in force which would cover the loss in whole or in part; or

(n)   loss or damage due to **Theft**, **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders And Counterfeit Currency Fraud**, **Credit Card Fraud** or other fraudulent, dishonest or criminal act (other than **Robbery** or **Safe Burglary**) committed by any authorized representative of an **Insured**, whether acting alone or in collusion with others; provided that this Exclusion 12(n) shall not apply to otherwise covered loss under Insuring Clause 1 or 9 resulting from **Theft** or **Forgery** committed by an **Employee** acting in collusion with such authorized representative.

13.   No coverage will be available under Insuring Clause 1 or 9 for:

(a)   loss caused by any agent, broker, factor, commission merchant, consignee, contractor, independent contractor, subcontractor or other similar representative; or

(b)   loss caused by an **Employee** which is sustained by an **Insured**:

   (i)   after an **Executive** or **Insurance Representative** becomes aware of a **Theft**, **Forgery** or other fraudulent, dishonest or criminal act committed by such **Employee** while employed with or in the service of an **Insured**;

   (ii)   after an **Executive** or **Insurance Representative** becomes aware of a **Theft**, **Forgery** or other fraudulent, dishonest or criminal act, involving **Money**, **Securities** or other property valued at twenty-five thousand dollars ($25,000) or more, committed by such **Employee** prior to employment or service with an **Insured**; or

   (iii)   more than sixty (60) days following the termination of such **Employee**.

14.   No coverage will be available under Insuring Clause 2 or 3 for:

(a)   loss or damage due to **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders And Counterfeit Currency Fraud** or **Credit Card Fraud**; or

(b)   loss of or damage to **Money**, **Securities** or **Property** while in the mail or in the custody of a carrier for hire other than an armored motor vehicle company.

15.   No coverage will be available under Insuring Clause 2, 3, 5, or 6 for loss or damage as a result of a kidnap, ransom or other extortion payment (as distinct from **Robbery**)

*Executive Protection Portfolio* <sup>SM</sup>
*Crime Coverage Section*

surrendered to any person as a result of a threat to do bodily harm to any person or a threat to do damage to any property.

16.   No coverage will be available under Insuring Clause 4 for loss due to **Forgery** or alteration of any registered or coupon obligation issued or purported to have been issued by an **Insured**, or any coupon whether attached or detached.

17    No coverage will be available under Insuring Clause 5 for loss caused by a **Third Party** which is sustained by an **Organization** sixty (60) days or more after an **Organization** becomes aware of a **Computer Fraud** or other fraudulent, dishonest or criminal act committed by such **Third Party**.

18.   No coverage will be available under Insuring Clause 8 for loss caused by any forgery or alteration of, on or in any written instrument; provided that this Exclusion 18 shall not apply if:

   (a)   the provisions, conditions and other terms under which the involved credit card was issued were fully complied with; and

   (b)   an **Organization** is legally liable to the issuer of such credit card for such loss.

19.   No coverage will be available under this coverage section for:

   (a)   loss unless sustained by an **Insured** prior to the termination of this coverage section as to such **Insured**, and **Discovered** and written notice thereof is given to the Company within sixty (60) days following such termination;

   (b)   loss unless sustained prior to the termination of any Insuring Clause or any particular coverage offered under any Insuring Clause, and **Discovered** and written notice thereof is given to the Company within sixty (60) days following such termination; or

   (c)   loss unless sustained prior to the termination of this coverage section in its entirety, and **Discovered** and written notice thereof is given to the Company within sixty (60) days following such termination;

   provided that in no event will coverage be available under this coverage section for such loss if such loss is covered under any renewal or replacement of this coverage section or any Insuring Clause or any particular coverage offered under any Insuring Clause.

---

*Ownership*

20.   Solely for the purposes of Insuring Clauses 1 through 8, the Company's liability under this coverage section will apply only to **Money, Securities** or **Property** owned by the **Organization** or for which the **Organization** is legally liable, or held by the **Organization** in any capacity whether or not the **Organization** is liable; provided that:

   (a)   the Company's liability will not apply to damage to the **Premises** unless the **Organization** is the owner of such **Premises** or is legally liable for such damage; or



*Executive Protection Portfolio* <sup>SM</sup>

*Crime Coverage Section*

CHUBB

(b) with respect to Insuring Clause 1, the Company's liability will not apply to **Money**, **Securities** or **Property** of a **Client**.

Solely for the purposes of Insuring Clause 9, the Company's liability under this coverage section will apply only to **Money, Securities** or **Property** owned by a **Client**, which is held by the **Organization** in any capacity or for which the **Organization** is legally liable.

## ERISA Plan

21. Solely with respect to loss sustained by an **ERISA Plan**, payment by the Company for covered loss to the **Parent Organization** shall be held by such **Parent Organization** for the use and benefit of the **ERISA Plan** sustaining such loss.

Solely with respect to loss sustained by an **ERISA Plan**:

(a) Insuring Clause 1 is amended to read in its entirety as follows:

The Company shall pay the **Parent Organization** for direct loss of **Money**, **Securities** or **Property** sustained by an **ERISA Plan** resulting from a fraudulent or dishonest act committed by an **Employee** acting alone or in collusion with others.

(b) The words "sixty (60) days" are deleted from Exclusion 19 of this coverage section, wherever they appear in such Exclusion, and the words "one (1) year" are substituted in place thereof.

No Retention shall apply to loss sustained by an **ERISA Plan** covered under this coverage section.

## Legal Expenses Extension

22. In addition to the Limits of Liability set forth in the Declarations for this coverage section, the Company shall pay the **Parent Organization** for:

(a) As a result of loss covered under Insuring Clause 4, reasonable court costs and attorneys' fees incurred and paid, with the Company's prior written consent, in defending an **Organization** or an **Organization's** bank in any legal proceeding brought against it to enforce payment of a **Financial Instrument**;

(b) As a result of loss covered under Insuring Clause 8, reasonable court costs and attorneys' fees incurred and paid, with the Company's prior written consent, in defending an **Organization** in any legal proceeding brought against it to enforce payment of a written instrument, required in connection with any credit card.

## Changes in Exposure

23. If before or during the **Policy Period** any **Organization**:

(a) acquires securities or voting rights in another organization or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or

*Executive Protection Portfolio* SM

*Crime Coverage Section*

(b)   acquires another organization by merger into or consolidation with such **Organization** such that such **Organization** is the surviving entity,

then coverage shall be provided for such acquired organization or new **Subsidiary** after the effective date of such acquisition or creation.

If the total revenues of any such acquired organization or new **Subsidiary** exceed ten percent (10%) of the total revenues of the **Parent Organization** (as reflected in the most recent audited consolidated financial statements of such organization and the **Parent Organization**, respectively, as of the date of such acquisition or creation), the **Parent Organization** shall give written notice of such acquisition or creation to the Company as soon as practicable, but in no event later than sixty (60) days after the date of such acquisition or creation, together with such information as the Company in its sole discretion may require and shall pay any reasonable additional premium required by the Company. If the **Parent Organization** fails to give such notice within the time specified in the preceding sentence, or fails to pay the additional premium required by the Company, coverage for such acquired organization or new **Subsidiary** shall be null and void from the date of such acquisition or creation. Coverage for such acquired organization or new **Subsidiary** shall be subject to such additional or different limitations, conditions, provisions or other terms as the Company in its sole discretion may require.

---

### Liability For Prior Losses

24.   In the event of loss sustained prior to the inception date of this coverage section, prior to the effective date of coverage for any additional insureds or prior to the effective date of any coverage added by endorsement, which would otherwise be covered under this coverage section, such prior loss shall be afforded coverage subject to the following:

(a)   an **Insured** or some predecessor in interest of such **Insured** carried a prior bond or policy, which at the time such prior loss was sustained, afforded some or all of the coverage of an Insuring Clause under this coverage section applicable to such prior loss;

(b)   such coverage continued without interruption from the time such prior loss was sustained until the inception date or effective date(s) as described above;

(c)   such prior loss was first **Discovered** by an **Insured** after the time allowed for discovery under the last such policy; and

(d)   some or all of the coverage of an Insuring Clause under this coverage section would be applicable to such prior loss.

If such prior bond or policy carried by the **Insured** or predecessor in interest of such **Insured** was issued by the Company or its affiliates, such prior bond or policy shall terminate as of the inception of this coverage section and such prior bond or policy shall not cover any loss not discovered and noticed to the Company prior to the inception of this coverage section.
The **Insured** shall neither be entitled to a separate recovery of the limits of each policy in force at the time any part of the prior loss was sustained, nor shall the **Insured** be entitled to recover the sum of the limits of liability of any such policies. The Company's maximum liability for such prior loss shall not exceed the lesser of the limit of liability of the policy in



*Executive Protection Portfolio* <sup>SM</sup>

*Crime Coverage Section*

force at the time such prior loss was sustained, or the applicable Limit of Liability as set forth in the Declarations for this coverage section.

*Limits of Liability and Retention*

25.   Subject to Subsection 24 Liability for Prior Losses, the Company shall only be liable for loss sustained by an **Insured** during the **Policy Period.**

The Company's maximum liability for each loss shall not exceed the Limit of Liability applicable to such loss, as set forth in Item 2 of the Declarations for this coverage section, regardless of the number of **Insureds** sustaining such loss.

The Company's maximum liability shall not exceed the Limit of Liability:

(a)   Applicable to Insuring Clause 1 as set forth in Item 2(A) of the Declarations for this coverage section: for all loss resulting from any act or any series of acts committed by the same **Employee** or in which the same **Employee** is concerned or implicated, regardless of whether such act or series of acts was committed before or during the **Policy Period;**

(b)   Applicable to Insuring Clause 2 as set forth in Item 2(B) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(c)   Applicable to Insuring Clause 3 as set forth in Item 2(C) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(d)   Applicable to Insuring Clause 4 as set forth in Item 2(D) of the Declarations for this coverage section: for all loss resulting from any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act or series of acts was committed before or during the **Policy Period;**

(e)   Applicable to Insuring Clause 5 as set forth in Item 2(E) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(f)   Applicable to Insuring Clause 6 as set forth in Item 2(F) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless

of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(g) Applicable to Insuring Clause 7 as set forth in Item 2(G) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(h) Applicable to Insuring Clause 8 as set forth in Item 2(H) of the Declarations for this coverage section: for all loss resulting from any act, casualty or event, any series of related acts, casualties or events, or any act or series of acts committed by the same **Third Party** or in which the same **Third Party** is concerned or implicated, regardless of whether such act, casualty or event or series of acts, casualties or events was committed or occurred before or during the **Policy Period;**

(i) Applicable to Insuring Clause 9 as set forth in Item 2(I) of the Declarations for this coverage section: for all loss resulting from any act or any series of acts committed by the same **Employee** or in which the same **Employee** is concerned or implicated, regardless of whether such act or series of acts was committed before or during the **Policy Period;** or

(j) Applicable to Insuring Clause 10 as set forth in Item 2(J) of the Declarations for this coverage section: for all **Investigative Expenses** or **Computer Violation Expenses** resulting from any applicable covered loss.

If a loss is covered under more than one Insuring Clause, the maximum amount payable under this coverage section shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

The Company's liability under this coverage section shall apply only to that part of each loss which is in excess of the applicable Retention set forth in Item 3 of the Declarations for this coverage section.

## Non-Accumulation of Liability

26. When there is more than one **Insured**, the maximum liability of the Company for loss sustained by any or all **Insureds** shall not exceed the amount for which the Company would be liable if all loss was sustained by any one **Insured.**

Regardless of the number of years this coverage remains in effect and the total premium amounts due or paid, whether under this coverage section, any prior bond or policy, or any renewal or replacement of this coverage section, the liability of the Company with respect to any loss shall not be cumulative from year to year or from policy period to policy period.

## Proof of Loss and Legal Proceedings

27. Knowledge possessed by any **Insured** or **Discovery** shall be deemed knowledge possessed by or discovery by all **Insureds.**



*Executive Protection Portfolio* <sup>SM</sup>

*Crime Coverage Section*

It is a condition precedent to coverage hereunder that, upon **Discovery**, the **Parent Organization** will:

(a)   give written notice to the Company at the earliest practicable moment, and in no event later than ninety (90) days after such **Discovery**;

(b)   furnish affirmative proof of loss with full particulars to the Company at the earliest practicable moment, and in no event later than six (6) months after such **Discovery**;

(c)   submit to examination under oath at the Company's request;

(d)   produce all pertinent records at such reasonable times and places as the Company shall designate; and

(e)   provide full cooperation with the Company in all matters pertaining to a loss or claim.

The **Parent Organization** may not offer, as a part of any proof of loss, any computation or comparison which involves in any manner a profit and loss computation or comparison. The **Parent Organization** may offer a comparison between an **Organization's** or **Client's** inventory records and actual physical count of its inventory to prove the amount of loss, only where an **Organization** or **Client** establishes wholly apart from such comparison that it has sustained a covered loss caused by an identified **Employee.**

No **Insured** shall institute legal proceedings against the Company:

(a)   after two (2) years immediately following any **Discovery**; or

(b)   to recover a judgment or settlement against it or its bank resulting from **Forgery, Credit Card Fraud** or related legal expenses as set forth in Subsection 22 Legal Expenses Extension, after two (2) years immediately following the date upon which such judgment shall become final or settlement was entered.

**Valuation and Foreign Currency**

28.   The Company shall pay:

(a)   the least of:

(i)   the actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**;

(ii)   the cost of replacing **Securities**; or

(iii)   the cost to post a Lost Instrument Bond;

(b)   the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records;

(c)   the least of:

*Executive Protection Portfolio* <sup>SM</sup>

*Crime Coverage Section*

    (i)    the actual cash value of **Property**; or

    (ii)    the cost to repair or replace **Property**, other than precious metals, with that of similar quality and value,

at the time the **Parent Organization** complies with Subsection 27 Proof of Loss and Legal Proceedings, regarding the furnishing of proof of loss;

    (d)    the United States of America dollar value of foreign currency based on the rate of exchange published in *The Wall Street Journal* on the day loss involving foreign currency is **Discovered**; or

    (e)    the United States of America dollar value of any precious metal based on the amount published in *The Wall Street Journal* Cash Prices, Precious Metals, on the day loss involving such precious metal is **Discovered**.

---

### Recoveries

29.    Recoveries for any loss covered under this coverage section, whether effected by the Company or by an **Insured**, less the cost of recovery, shall be distributed as follows:

    (a)    first, to an **Insured** for the amount of such loss, otherwise covered, in excess of the applicable Limits of Liability;

    (b)    second, to the Company for the amount of such loss paid to an **Insured** as covered loss;

    (c)    third, to an **Insured** for the Retention applicable to such loss;

    (d)    fourth, to an **Insured** for the amount of such loss not covered under this coverage section.

Recovery from reinsurance or indemnity of the Company shall not be deemed a recovery hereunder.

---

### Other Insurance

30.    If any **Insured** or any other party in interest in any loss covered by this coverage section has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this coverage section, then this coverage section shall be null and void to the extent of the amount recoverable or received under such bond, indemnity, or insurance; provided that this coverage section shall cover such loss, subject to its limitations, conditions, provisions and other terms, to the extent of the amount of such loss in excess of the amount recoverable or received under such bond, indemnity or insurance.



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

AMEND PROOF OF LOSS AND LEGAL PROCEEDINGS ENDORSEMENT

In consideration of the premium charged, it is agreed that the third paragraph of Subsection 27, Proof of Loss and Legal Proceedings, of this coverage section is amended to read in its entirety as follows:

> The **Parent Organization** may not offer, as a part of any proof of loss, any computation or comparison which involves in any manner a profit and loss computation or comparison. The **Parent Organization** may offer a comparison between an **Organization's** or **Client's** inventory records and actual physical count of its inventory to prove the amount of loss, only where an **Organization** or **Client** establishes wholly apart from such comparison that it has sustained a covered loss caused by an **Employee**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section:  Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 2

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

TAX COMPENSATION COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that the Company shall adjust the amount of any loss paid in the United States to compensate for additional federal or state tax liability incurred by the Insured as a result of the payment of such loss in the United States rather than in the country in which such loss was sustained, provided that:

A. The loss was sustained by an entity not subject to United States or state tax provisions; and

B. The payment for such loss is reportable income under the Internal Revenue Code and regulations or the tax laws of any state or commonwealth of the United States.

Loss payment shall be adjusted using the following formula:

**Final payment =**

**Loss Payment times**     One minus the Marginal Foreign Tax Rate
                          One minus the Sum of the Marginal United
                          States and State Tax Rates

Definitions

**Final Payment** means the amount paid after the tax adjustment described in this endorsement.

**Loss payment** means the amount to be paid prior to the tax adjustment described in this endorsement.

**Marginal Foreign Tax Rate** means the marginal rate of income taxation of the insured entity which sustained the loss for the tax year in which such loss is written off.

**Marginal United States and State Tax Rates** means the marginal rates of Federal and State income taxation of the Insured which pays the loss in the United States for the tax year in which such loss is written off and shall include, if any, foreign tax credits accruing as a result of such loss.

Conditions

1. Nothing contained in this endorsement shall be construed to increase the Company's liability above the amount set forth in the Limits of Liability.

14-02-3037 (11/1999)               Page 1

2.   Nothing contained in this endorsement shall be construed to decrease the Company's liability below the original amount of loss payment.

3.   The **Insured** shall cooperate with any attempt by the Company to pay the loss directly to the entity sustaining the loss.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 3

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

## AMEND DEFINITION OF ERISA PLAN ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **ERISA Plan**, as defined in Subsection 11 Definitions of this coverage section, is amended to include the following plan(s):

     Parker Hannifin Consolidated Pension Plan

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 4

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND DEFINITION OF ERISA PLAN ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **ERISA Plan**, as defined in Subsection 11
Definitions of this coverage section, is amended to include the following plan(s):

     Savings Restoration Plan
     Pension Restoration Plan
     Stock Employee Compensation Trust (SECT)
     Long Term Incentive Plan (LTIP)
     Supplemental Executive Retirement Plan (SERP)
     Non-Qualified Plans

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative


CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 5

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

AMEND ITEM 4 ORGANIZATION ENDORSEMENT

In consideration of the premium charged, it is agreed that Item 4 of the Declarations for this coverage section is amended to include the following organization(s):

Parker Hannifin Foundation

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative



CHUBB

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 6

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

---

### AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Employee**, as defined in Subsection 11 Definitions of this coverage section, is amended to include any former natural person employee of an **Organization** while in the regular service of such **Organization** as a consultant pursuant to a written contract between such person and such **Organization**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 7

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

## AMEND ITEM 3 OF THE DECLARATIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that Item 3 of the Declarations for this coverage section is amended to read in its entirety as follows:

Item 3. Retention:

| (A) | Insuring Clause 1 | - Employee Theft Coverage: | $500,000 |
|-----|-------------------|-----------------------------|----------|
| (B) | Insuring Clause 2 | - Premises Coverage: | $500,000 |
| (C) | Insuring Clause 3 | - In Transit Coverage: | $500,000 |
| (D) | Insuring Clause 4 | - Forgery Coverage: | $500,000 |
| (E) | Insuring Clause 5 | - Computer Fraud Coverage: | $500,000 |
| (F) | Insuring Clause 6 | - Funds Transfer Fraud Coverage: | $500,000 |
| (G) | Insuring Clause 7 | - Money Orders And Counterfeit Fraud Coverage: | $10,000 |
| (H) | Insuring Clause 8 | - Credit Card Fraud Coverage: | $10,000 |
| (I) | Insuring Clause 9 | - Client Coverage: | $500,000 |
| (J) | Insuring Clause 10 | - Expense Coverage: | $0 |

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____

Authorized Representative


CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 8

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

DELETE EXCLUSION 17 ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion 17 of this coverage section is deleted.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 9

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   The term **Employee**, as defined in Subsection 11, Definitions, of this coverage section, is amended to include any natural person independent contractor while in the regular service of an **Organization** in the ordinary course of such **Organization's** business whose services are under the exclusive direction of such **Organization** pursuant to a written contract (a "Contractual Independent Contractor").

(2)   Subsection 13 Exclusion (a) of this coverage section is amended to read in its entirety as follows:

    (a)   loss caused by any agent, broker, factor, commission, merchant, consignee, contractor, independent contractor (other than a Contractual Independent Contractor), subcontractor or other similar representative;

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section:  Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 10

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

### JOINT VENTURE ENDORSEMENT

In consideration of the premium charged, it is agreed that term **Subsidiary**, as defined in Subsection 11 Definitions of this coverage section, is amended to include any joint venture(s) in which the **Parent Organization** has an equity interest; provided that the coverage available to any joint venture specified above shall only apply pro rata based on the proportion of the **Parent Organization's** equity interest in such joint venture.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 11

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

---

AMEND EXCLUSION 19 ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion 19 of this coverage section is amended to read in its entirety as follows:

19.  No coverage will be available under this coverage section for:

(a)  loss unless sustained by an **Insured** prior to the termination of this coverage section as to such **Insured**, and **Discovered** and written notice thereof is given to the Company within ninety (90) days following such termination;

(b)  loss unless sustained prior to the termination of any Insuring Clause or any particular coverage offered under any Insuring Clause, and **Discovered** and written notice thereof is given to the Company within ninety (90) days following such termination; or

(c)  loss unless sustained prior to the termination of this coverage section in its entirety, and **Discovered** and written notice thereof is given to the Company within ninety (90) days following such termination;

provided that in no event will coverage be available under this coverage section for such loss if such loss is covered under any renewal or replacement of this coverage section or any Insuring Clause or any particular coverage offered under any Insuring Clause issued by the Company or by any affiliate of the Company.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____

Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 12

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

AMEND SUBSECTION 23 CHANGES IN EXPOSURE ENDORSEMENT

In consideration of the premium charged, it is agreed that the second paragraph of Subsection 23 Changes in Exposure of this coverage section is amended to read in its entirety as follows:

If the total revenues of any such acquired organization or new **Subsidiary** exceed ten percent (10%) of the total revenues of the **Parent Organization** (as reflected in the most recent audited consolidated financial statements of such organization and the **Parent Organization**, respectively, as of the date of such acquisition or creation), the **Parent Organization** shall give written notice of such acquisition or creation to the Company as soon as practicable, but in no event later than ninety (90) days after the date of such acquisition or creation, together with such information as the Company in its sole discretion may require and shall pay any reasonable additional premium required by the Company.  If the **Parent Organization** fails to give such notice within the time specified in the preceding sentence, or fails to pay the additional premium required by the Company, coverage for such acquired organization or new **Subsidiary** shall be null and void from the date of such acquisition or creation.  Coverage for such acquired organization or new **Subsidiary** shall be subject to such additional or different limitations, conditions, provisions or other terms as the Company in its sole discretion may require.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

Robert Hamburger

---
Authorized Representative



CHUBB

ENDORSEMENT

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 13

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND SUBSECTION 25 LIMITS OF LIABILITY AND RETENTION ENDORSEMENT

In consideration of the premium charged, it is agreed that Subsection 25 Limits of Liability and Retention is amended to include the following:

If any loss is covered in part under this coverage section and in part under a prior bond or policy, the applicable Retention set forth in Item 3 of the Declarations for this coverage section shall be reduced by the retention applied to such loss by the superseded insurance carrier.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 14

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND VALUATION OF SECURITIES ENDORSEMENT

In consideration of the premium charged, it is agreed that subparagraph (a) of Subsection 28 Valuation and Foreign Currency of this coverage section is amended to read in its entirety as follows:

    (a)   the actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**, or the cost of replacing such **Securities**, whichever is less, plus the cost to post a Lost Instrument Bond;

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____

Authorized Representative

14-02-8925 (11/2003)           Page 1



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 15

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND EXCLUSIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)   Exclusion 12(j) of this coverage section is deleted.

(2)   No coverage will be available under Insuring Clause 2 or 3 for loss or damage due to fire;
provided that this Exclusion shall not apply to:

   (i)   loss of **Money** or **Securities**; or

   (ii)   damage to any safe or vault caused by the application of fire thereto for the purposes of **Safe
Burglary.**

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

14-02-8926 (11/2003)                Page 1



CHUBB

**ENDORSEMENT**

Coverage Section:  Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 16

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

AMEND EXCLUSIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)    Exclusion 12(a) of this coverage section is deleted.

No coverage will be available under Insuring Clause 1 or 9 of this coverage section for loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Property**, whether or not in the name of an **Insured** and whether or not in a genuine or fictitious account; provided that this Exclusion shall not apply to otherwise covered loss under Insuring Clause 1 or 9 which results in improper financial gain to an **Employee** (such loss shall mean only the amount of improper financial gain to such **Employee**, and shall not include **Salary**, commissions, fees or other compensation, including but not limited to promotions and raises associated with employment, paid by the **Insured** to such **Employee**).

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 17

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

AMEND EXCLUSIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Exclusion 12(k) of this coverage section is deleted.

(2)     No coverage will be available under Insuring Clause 2, 3, 4, 5, 6, or 8 for loss due to an **Insured** knowingly having given or surrendered **Money**, **Securities** or **Property** in any exchange or purchase with a **Third Party**; provided that this Exclusion shall not apply to otherwise covered loss of **Property** under Insuring Clause 5.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 18

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

## AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Employee**, as defined in Subsection 11 Definitions of this coverage section is amended to read in its entirety as follows:

**Employee** means any:

(a)   natural person while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** compensates by **Salary** and has the right to govern and direct in the performance of such service, including any part-time or seasonal employee;

(b)   natural person while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** has the right to govern and direct in the performance of such service and is assigned to perform such service by any agency furnishing leased personnel or temporary personnel on a contingent or part-time basis; provided that **Employee** shall not include such a natural person, and no coverage will be available under this coverage section for loss caused by such a natural person, if such loss is covered under any bond, indemnity or insurance held by the agency furnishing such personnel;

(c)   natural person volunteer while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** has the right to govern and direct in the performance of such service;

(d)   **Executive** while performing acts within the scope of the usual duties of an **Employee**; or

(e)   natural person fiduciary, trustee, administrator or other plan official, while in the regular service of an **ERISA Plan**, who is required to be bonded by an **Organization** in connection with such **ERISA Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

14-02-8931 (1/2004) rev.          Page 1

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____

Authorized Representative



**ENDORSEMENT**

Coverage Section:  Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 19

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

## AMEND DEFINITION OF SECURITIES ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Securities**, as defined in Subsection 11 Definitions of this coverage section is amended to include revenue and other stamps in current use, tokens and tickets. **Securities** does not include **Money**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 20

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

AMEND MONEY ORDERS AND COUNTERFEIT CURRENCY FRAUD ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Money Orders And Counterfeit Currency Fraud**, as defined in Subsection 11 Definitions of this coverage section, is amended to read in its entirety as follows:

**Money Orders And Counterfeit Currency Fraud** means the good faith acceptance by an **Organization:**

(a)     in exchange for merchandise, **Money** or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or

(b)     in the regular course of business, of counterfeit paper currency.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

---
Authorized Representative



ENDORSEMENT

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 21

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

---

## AMEND EXCLUSION 12(h)(ii) ENDORSEMENT

In consideration of the premium charged, it is agreed that subparagraph (h)(ii) of Exclusion 12 of this coverage section is amended to read in its entirety as follows:

(ii)     to render **Data** usable by replacement processing equipment;

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

Robert Hamburger

_____

Authorized Representative



CHUBB

**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company: Federal Insurance Company

Endorsement No. 22

To be attached to and
form a part of Policy No. 8159-0221

Issued to: PARKER HANNIFIN CORPORATION

---

AMEND DEFINITION OF COMPUTER SYSTEM ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Computer System**, as defined in Subsection 11 Definitions of this coverage section, is amended to read in its entirety as follows:

**Computer System** means a computer and all input, output, processing, storage, off-line media library and communication facilities which are connected to such computer, provided that such computer and facilities are:

(a)   owned and operated by an **Organization**;

(b)   leased and operated by an **Organization**; or

(c)   utilized by an **Organization**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative



**ENDORSEMENT**

Coverage Section: Executive Protection Portfolio Crime Coverage Section (Federal & Vigilant)

Effective date of
this endorsement: January 31, 2007

Company:  Federal Insurance Company

Endorsement No. 23

To be attached to and
form a part of Policy No. 8159-0221

Issued to:  PARKER HANNIFIN CORPORATION

AMEND SUBSECTION 20 OWNERSHIP ENDORSEMENT

In consideration of the premium charged, it is agreed that the second paragraph of Subsection 20 Ownership is
amended to read in its entirety as follows:

Solely for the purposes of Insuring Clause 9, the Company's liability under this coverage section will apply
only to **Money, Securities** or **Property:**

(a)     owned by a **Client,** which is held by the **Organization** in any capacity or for which the **Organization**
is legally liable; or

(b)     held by the **Client,** for which the **Client** is legally liable.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

# EXHIBIT B

**AIG** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

A CAPITAL STOCK COMPANY
175 WATER STREET, NEW YORK, NY  10038

## FOLLOW FORM POLICY

### DECLARATIONS

POLICY NUMBER:   966-43-75

ITEM 1.   NAMED INSURED:   *PARKER HANNIFIN CORPORATION*

     ADDRESS:   *6035 PARKLAND BOULEVARD*
*CLEVELAND, OH 44124-4418*

ITEM 2.   POLICY PERIOD: FROM *January 31, 2007*   TO *January 31, 2008*   AT
12:01 STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

ITEM 3.   LIMIT OF LIABILITY:   *$15,000,000*   Excess of *$25,000,000*
Excess of Underlying Deductible of  *$500,000*

ITEM 4.   SCHEDULE OF UNDERLYING INSURANCE:

Underlying Insurance Policy
A)   Insurer: *Chubb*
B)   Policy No: *512612*
C)   Policy Term: *01/31/2007 TO 01/31/2008*
D)   Limit: *$25,000,000*   with a *$500,000*   Deductible

ITEM 5.   ENDORSEMENTS ATTACHED:
*#1,#2,#3,#4,#5*

_Elizabeth M. Tuck_
SECRETARY

_[signature]_
PRESIDENT

_[signature]_
AUTHORIZED REPRESENTATIVE

_____   _____   _____
COUNTERSIGNATURE   DATE   COUNTERSIGNED AT

*AON RISK SERVICES, INC. OF ILLINOIS*
*200 E RANDOLPH ST*
*CHICAGO, IL 60601*

*7137821*

# 371080

 **NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.**

A CAPITAL STOCK COMPANY
175 WATER STREET, NEW YORK, NY   10038

### FOLLOW FORM POLICY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured as shown in Item 1 of the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations and in the Application, we agree with you to provide coverage as follows:

### INSURING AGREEMENT

**I.   Coverage**

A.   We will pay on your behalf the Ultimate Net Loss in excess of the Underlying Insurance Policy as shown in Item 4 of the Declarations, but only up to an amount not exceeding our Limit of Liability as in Item 3 of the Declarations and only after the issuers of the Underlying Insurance Policy have paid or have been held liable to pay the full amount of limits of Insurance of the Underlying Insurance Policy. Except for the terms, definitions, conditions and exclusions of this policy, the coverage provided by this policy shall follow the terms, definitions, conditions and exclusions of the Underlying Insurance Policy as shown in Item 4 of the Declarations.

B.   The Limit of Liability shown in Item 3 of the Declarations states the most we will pay regardless of the number of Insureds, claims made or suits brought or persons, organizations making claims or bringing suits.

**II.   Definition**

A.   Ultimate Net Loss

The term "Ultimate Net Loss" means the amount payable in settlement of the loss of the Insured after making deductions for all recoveries and for other valid and collectible insurance, except however the Underlying Insurance shown in Item 4 of the Declarations.

**III.   Conditions**

A.   Maintenance of Limit of Liability of Underlying Insurance Policy

The limit of liability of the Underlying Insurance Policy shall be maintained in full force and effect during the period of this policy. Under no circumstances, including but not limited to bankruptcy, insolvency or inability to pay at the issue of the Underlying Insurance Policy, will we drop down and replace the Underlying Insurance Policy or assume any obligation of the Underlying Insurance Policy.

If you fail to comply with this requirement, we will only be liable to the same extent that we would have been had you fully complied with this requirement.

B.   Cancellation

1.   You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

63673 (10/95)   *INSUArchive Copy*                    1

2. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten- (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than thirty- (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. If we cancel, earned premium will be calculated pro rata based on the time this policy was in force.

5. If you cancel, earned premium will be calculated based on short rate tables.

6. The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

7. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

C. Cancellation of Underlying Insurance Policy

This policy is canceled upon cancellation of the Underlying Insurance Policy. You must promptly notify us of the cancellation of the Underlying Insurance Policy. Such notice must be made when you send a notice of cancellation of the Underlying Insurance Policy to, or when you receive such notice from, the issuer of the Underlying Insurance Policy.

D. Changes to Underlying Insurance Policy

You must promptly notify us of any changes to the Underlying Insurance Policy which are made after its inception. Any changes made to the Underlying Insurance Policy after its inception shall not affect the terms and conditions of this policy, which shall continue to apply as though no change had been made to the Underlying Insurance Policy.

E. Notice of Claim or Loss

You must notify us in writing as soon as practicable when you become aware of any claim or loss under the Underlying Insurance Policy or any policy which may give rise to any claim or loss under this policy.

F. Payment of Premium

The first named Insured shown in Item 1 of the Declarations shall be responsible for payment of all premiums when due.

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by one of our duly authorized representatives, where required by law.

*Elizabeth M. Tuck*

SECRETARY

PRESIDENT

## ENDORSEMENT# 1

This endorsement, effective *12:01 am*      *January 31, 2007*      forms a part of
policy number   *966-43-75*
issued to *PARKER HANNIFIN CORPORATION*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### OHIO CANCELLATION/NONRENEWAL ENDORSEMENT
### (CLAIMS-MADE POLICIES)

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" means the insurance company that issued this policy; and 2) "you", "your", or "Insured", means the Named Corporation, Named Organization, Named Sponsor, Named Insured, First Named Insured, Insured's Representative, Insured or equivalent term stated in Item 1 of the Declarations Page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is understood and agreed that the cancellation provision of the Policy is deleted in its entirety and replaced by the following:

#### CANCELLATION

This policy may be cancelled by the named Insured by surrender thereof to the Insurer or any of its authorized agents or by mailing to the Insurer written notice stating when thereafter the cancellation shall be effective.

After coverage has been in effect for more than (90) ninety days or after the effective date of the renewal of the policy, a notice of cancellation shall not be issued by the Insurer unless it is based on at least one of the following reasons:

a)   Nonpayment of premium;

b)   Discovery of fraud or material misrepresentation in the procurement of the insurance;

c)   Discovery of willful or reckless acts or omissions on the part of the Named Insured or Other Insured(s) which increase any hazard insured against;

d)   The occurrence of a change in the individual risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed, except to the extent the insurer reasonably should have foreseen the change or contemplated the risk in writing the contract;

e)   Loss of or substantial decrease in applicable reinsurance (if the superintendent has determined that reasonable efforts have been made to prevent the loss of, or substantial decrease in, the applicable reinsurance, or to obtain replacement coverage);

f)   Failure of an Insured or Other Insured(s) to correct material violations of safety codes or to comply with reasonable written loss control recommendations; or

g)   A determination by the director of insurance that the continuation of the Policy would create a condition that would be hazardous to the Insured or Other Insured(s) or to the public.

The notice of cancellation will be in writing, be mailed to the Insured at the last known address, and contain all of the following:

-   The policy number;

### END 001

)                                                    )

ENDORSEMENT# *1*      (continued)

- The date of notice;
- The effective date of cancellation (Except for nonpayment of premium, the effective date of cancellation shall not be less than (30) thirty days from the date of mailing the notice. When cancellation is for nonpayment of premium, the effective date of cancellation shall be no less than (10) ten days from the date of mailing the notice); and
- An explanation of the reason for cancellation.

In addition, the Policy is amended to include the following:

## NONRENEWAL

The Insurer shall provide at least (30) thirty days written notice of its intention not to renew the policy at its expiration date.

## NOTICE REQUIREMENTS FOR INCREASE IN PREMIUM

An insurer who intends to condition renewal upon a substantial increase in premium shall mail a notice of such intention to the agent of record and to the Insured at least (30) thirty days prior to the expiration date of the policy. If the notice is mailed less than (30) thirty days before the expiration date of the policy the Insured's coverage then in effect remains in effect until (30) thirty days after the date of mailing the notice.

## OTHER DUTIES OF THE INSURER

The Insurer will provide the Insured the following information relating to this and any preceding claims-made Policy issued to the Insured by the Insurer during the previous three years:

1.   A list or other record of each claim, not previously reported to any other insurer, of which the Insurer has been notified in accordance with the Policy terms and conditions. The Insurer will include the date and brief description of each claim if that information was in the notice the Insurer received.

2.   A summary by policy year, of payments made and amounts reserved, stated separately, under any applicable General Aggregate Limit.

Amounts reserved are based on the Insurer's judgment. They are subject to change and should not be regarded as ultimate settlement values.

The Insured (or Other Insured(s)) must not disclose this information to any claimant or any claimant's representative without the Insurer's consent.

If the Insurer cancels or elects not to renew this Policy, the above information shall be provided no later than (30) thirty days before the date of policy termination. In other circumstances, the Insurer will provide this information only if the Insurer receives a written request from the Insured within (60) sixty days after the end of the policy period. In this case, the Insurer will provide this information within (45) forty-five days of receipt of the request.

The Insurer compiles claim information for its own business purposes and exercises reasonable care in doing so. In providing this information to the Insured, the Insurer makes no representations or warranties to the Insured, any Other Insureds, insurers, or others to whom this information is furnished by or on behalf of the Insured. Cancellation or non-renewal will be effective even if the Insurer inadvertently provides inaccurate information.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

**END 001**

)     ENDORSEMENT# *2*     )

This endorsement, effective  *12:01 am*     *January 31, 2007*     forms a part of
policy number  *966-43-75*
issued to   *PARKER HANNIFIN CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## FOLLOW FORM ENDORSEMENT

It is agreed that:

1.     Coverage under the attached policy shall not be follow form of the following
Insuring Clauses found on the Underlying Insurance Policy:

    Insuring Clause 7-    Money Order and Counterfeit Fraud Coverage

    Insuring Clause 8 -   Credit Card Fraud Coverage

    Insuring Clause 10 - Expense Coverage

2.     Nothing herein contained shall beheld to vary, alter, waive, or extend any of the
terms, conditions, provisions, agreements or limitations of the attached policy other
than as stated herein.

_____
AUTHORIZED REPRESENTATIVE

*INSt**Archive Copy**END 2*

) ENDORSEMENT# 3 )

This endorsement, effective *12:01 am*     *January 31, 2007*     forms a part of
policy number   *966-43-75*
issued to   *PARKER HANNIFIN CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### RELIANCE ENDORSEMENT

### RELIANCE UPON
### OTHER CARRIER'S APPLICATION

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the
statements and representations contained in the below referenced application (including
materials submitted thereto and, if such application is a renewal application, all such
previous policy applications, and their attachments and materials, for which this policy is a
renewal or succeeds in time) as being accurate and complete. It is further understood and
agreed that the **Organization** and the **Insureds** warrant and represent to the **Insurer** that the
statements and representations made in such application were accurate on the date such
representations and statement were so given and that in connection therewith the **Insureds**
hereby reaffirm each and every statement made in the application to Chubb Group of
Insurance Companies as accurate as of 12/21/06 as if it was made to the **Insurer** on such
date. All such statements and representations shall be deemed to be material to the risk
assumed by the **Insurer**, are the basis of this policy and are to be considered as
incorporated into this policy.

| TYPE OF POLICY APPLICATION | CARRIER | DATE SIGNED |
|---|---|---|
| Executive Protection Portfolio<br>- crime coverage renewal application | Chubb | 12-21-06 |

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*INSUArchive Copy END 3*

)                                              )

## ENDORSEMENT# *4*

This endorsement, effective *12:01 am*     *January 31, 2007*     forms a part of
policy number   *966-43-75*
issued to *PARKER HANNIFIN CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### COVERAGE TERRITORY ENDORSEMENT

Payment of loss under this policy shall only be made in full compliance with all United
States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

_____

AUTHORIZED REPRESENTATIVE

*END 004*

ENDORSEMENT# *5*

This endorsement, effective *12:01 am*     *January 31, 2007*          forms a part of
policy number    *966-43-75*
issued to *PARKER HANNIFIN CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 63672 | 10/95 | Follow Form Policy - Dec |
| 63673 | 10/95 | Follow Form Policy - Guts |
| 75213 | 10/06 | OHIO AMENDATORY - CANCELLATION/NONRENEWAL |
| MNSCPT | | FOLLOW FORM ENDORSEMENT |
| MNSCPT | | RELIANCE ENDORSEMENT |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| 78859 | 10/01 | Forms Index Endorsement |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*Archive Copy*